[S. F. No. 14095. In Bank.—May 28, 1931.]

STELLA M. LEVISTON, as Executrix, etc., Appellant, v. JOHN TONNINGSEN, Defendant and Appellant; E. F. FITZPATRICK et al., Copartners, etc., Defendants; ERNEST FORBES et al., as Trustees, Interveners and Appellants; GOLDEN GATE LAND ASSOCIATION (a Corporation), Intervener and Respondent.

John L. McNab, R. M. J. Armstrong and Ernest K. Little for Appellant.

Grant & Zimdars, James F. Peck and Henry E. Monroe for Respondent.

THE COURT.—Plaintiff, defendant Tonningsen, and trustee interveners appeal from a judgment declaring that defendant Tonningsen holds the title to certain described real property in trust for intervener Golden Gate Land Association. By its judgment the trial court declared that the entire beneficial title to the property was vested in the Golden Gate Land Association and that none of the other parties had any right, title or interest therein.

The action was commenced by the executrix of the will of one Charles L. Patton, against Tonningsen and other named defendants (all of whom except Tonningsen have disclaimed any interest in the property) to have it declared that the plaintiff owns an undivided half interest in certain described real property standing in the name of Tonningsen. The complaint alleges that at the time the legal title was conveyed to Tonningsen, it was agreed between Tonningsen and Patton that the former was to hold the legal title in equal shares for himself and Patton.

Defendant Tonningsen, by answer, denied all of the allegations of the complaint pertaining to the alleged trust, and claimed the entire property, both the legal and equitable interest, for himself alone, alleging that he had purchased the property from one, H. C. Tuchsen, on October 3, 1918, who had purchased it from the Golden Gate Land Association.

Subsequently, trustee interveners, with permission of court, filed their complaint in intervention, alleging that the plaintiff had conveyed to them all of the interest of the estate of Patton in the property and that by virtue of this conveyance an undivided half interest in the property had become vested in them. Plaintiff admits the validity of this conveyance, so that for the purposes of this appeal, the interest of these trustee interveners and the interest of plaintiff is identical.

At a later date, by permission of court, the Golden Gate Land Association filed its complaint in intervention in which it was alleged that Tonningsen holds the legal title in trust for this intervener and that none of the other parties had any interest therein. All of the other parties to this action denied that the Golden Gate Land Association had any interest in the property.

Upon these conflicting claims the case proceeded to trial before the court without a jury. The trial court decided in favor of the Golden Gate Land Association and entered its judgment declaring that defendant Tonningsen holds the entire title in trust for the benefit of this intervener. From the judgment so entered, and from the order denying a motion for a new trial, plaintiff, defendant, and trustee interveners appeal, contending that certain findings are unsupported by the evidence and that the action is barred by the statute of limitations as far as the Golden Gate Land Association is concerned.

In order to understand the contentions of appellants it is necessary to trace the history of the real property involved. In 1904 parties by the name of Siminoff, Patton and Tonningsen entered into an agreement to acquire the lands involved herein, and did so with money advanced by Siminoff. The land was purchased for the purpose of reselling the same to the Odd Fellows Cemetery Association for cemetery purposes. After they had purchased the land the three purchasers entered into an agreement with the cemetery association whereby the cemetery association agreed to buy these lands, paying therefor fifty per cent of the sums received by it in retailing the lands for cemetery purposes. To facilitate the handling of the property, the three men named above formed respondent corporation, Golden Gate Land Association, with a capital stock of 250,000 shares, and conveyed their interests in the land and in the

contract to this corporation. The corporation then floated a $125,000 bond issue. From the money thus received Siminoff was repaid $83,000, supposedly advanced by him for the purchase of the property, and the balance was divided by the three men. Patton and Tonningsen advanced no cash in the transaction, Patton, an attorney, contributing his legal services, and Tonningsen, contributing an option which he held on part of the property, and his services. The stock of the corporation was then divided so that each of the three men held about one-third thereof. From time to time some of this stock was sold to some 70 stockholders, all of whom were stockholders at the time this case was tried.

After the corporation had floated the bond issue and the stock had been divided as outlined above, the cemetery association breached its contract with the Golden Gate Land Association, and, as a result, the corporation defaulted in the payment of interest on the bonds. This caused the market value of the bonds to drop to a fraction of their former value, whereupon the cemetery association purchased about ninety per cent of the outstanding bonds at a low price. The cemetery association then called upon the trustee to foreclose the bonds, which was done in 1917. The corporation took no appeal from the foreclosure judgment, although the judgment purported to cut off the corporation's right of redemption. In accordance with the foreclosure decree the land was sold by court order, the Odd Fellows Cemetery Association purchasing it for $9,960. A deficiency judgment was entered against the Golden Gate Land Association and in favor of the trustees for the benefit of the bondholders in the sum of $131,625.

Many years before the foreclosure action, after it had become apparent that the respondent corporation must default on the bonds, Patton and Tonningsen had transferred their stockholdings in Golden Gate Land Association to one Charles Bone, in order to evade stockholders' liability. At the time of trial it was stipulated that Bone held 72,500 shares of Golden Gate Land Association stock for the benefit of Tonningsen and 59,640 shares for the benefit of Patton's estate. Bone owned in his own right 75 shares. Siminoff died in 1907 possessed of 67,225 shares, all of which shares have been purchased by Tonningsen since the commencement of this action. Patton up to the time of his death in 1923,

in addition to the shares held for his benefit by Bone, had the legal title to 2,000 shares, the beneficial ownership of which was in another.

After 1908 or 1909 no meetings of the stockholders or directors of Golden Gate Land Association were held, the corporation having forfeited its franchise for nonpayment of taxes. After the foreclosure sale in 1917, Patton, whom Bone testified was one of the attorneys for the corporation, tried to work out some scheme for getting the land back for the corporation. At one time he drew up a complaint against the Odd Fellows Cemetery Association, charging them with breach of contract, but later he dropped this plan as impracticable. Some time in 1918 he consulted with another, Donzel Stoney, who was connected with a title insurance company. Stoney advised that in his opinion the foreclosure decree of 1917 was void because it purported to cut off the corporation's right of redemption and suggested that the rights of the corporation could be revived by a tender to the Odd Fellows Cemetery Association of the amount of their bid. Stoney also pointed out that this plan was accompanied by the danger that in the event respondent corporation thus recovered the land, the trustee of the bonds might then attempt to collect the deficiency judgment. He suggested that the corporation convey the land to a third person and permit this transferee to make the tender.

The above facts clearly appear in the record. What happened immediately after Patton's interview with Stoney, and the intent with which these acts were performed, are the principal questions presented on these appeals.

It is clear that after Patton had consulted Stoney, Patton and Tonningsen, as the beneficial owners of two-thirds of the stock, determined to revive the Golden Gate Land Association. A meeting of the stockholders was called for September 7, 1918, in Redwood City, at the office of Mr. Fitzpatrick, one of the attorneys of the corporation. In addition to Fitzpatrick, who held no stock, there were present Bone, who voted the Patton and Tonningsen stock and also his own 75 shares; Patton, who held 2,000 shares in his own name; Atherstone, who owned 250 shares; Swift, who owned 25 shares, and one Coleman, who was not a stockholder but to whom Bone transferred 25 shares of the stock standing in his name at the suggestion of Patton,

·in order to qualify Coleman as a director. From the minutes of the stockholders' meeting of September 7, 1918, it appears that Patton, Bone, Coleman, Atherstone and Swift were elected directors, and it was resolved that the officers of the corporation be directed to retain counsel and to take all steps necessary to recover the corporate property from the Odd Fellows Cemetery Association. It was further resolved that the officers were empowered to sell the land of the corporation if they deemed it necessary. Upon the adjournment of the stockholders' meeting, a directors' meeting was immediately called and Bone was elected president of the corporation and the president and secretary, Atherstone, were ordered to carry out the resolution of the stockholders. The directors at this same meeting, by resolution, recognized a $5,000 indebtedness to Fitzpatrick as and for attorneys' fees, and ordered that it be paid out of any moneys received by the corporation for the property.

Although controverted by respective appellants, there can be no doubt of the correctness of the trial court's finding that this board of directors was controlled by Patton and Tonningsen. Patton was the attorney, confidant and business adviser of Tonningsen, and the evidence clearly shows that at that time, at least, these two men were acting jointly in this matter. Patton was a member of the board; Patton and Tonningsen controlled Bone by virtue of their beneficial ownership of most of the stock held by him. Patton obviously controlled Coleman, having caused 25 shares to be transferred to him to qualify him as a director. Thus a majority of the board was controlled by Patton and Tonningsen.

Fitzpatrick then secured one H. C. Tuchsen, who was willing to act as a dummy transferee of the property. Bone and Atherstone, as president and secretary of the corporation, respectively, upon orders from Patton, then executed a grant, bargain and sale deed conveying all of the land belonging to the corporation to Tuchsen. Tuchsen paid to the corporation for the property the sum of $1,000, which was admittedly secured in the following manner. Tonningsen issued his personal check in the sum of $1,000 payable to Fitzpatrick, who cashed the check and handed the money to Tuchsen, who immediately handed it back to Fitzpatrick as payment for the land. Tuchsen advanced no money of his own, nor did he borrow or become obligated to repay the

$1,000 so secured. The board of directors then immediately ordered that the entire $1,000 be paid to Fitzpatrick as part payment of his bill for attorney fees. Whether Fitzpatrick actually kept this money or returned it to Tonningsen does not appear. Tonningsen testified that it was not so returned, but there are several factors which cast some doubt on this statement. It should be here noted that Fitzpatrick, Atherstone and Patton were all dead at the time of the trial, so that their testimony could not be secured.

A few days after the property had been deeded to Tuchsen, Tonningsen secured $12,500 in gold and gave it to Tuchsen for the purpose of making a tender to the Odd Fellows Cemetery Association to redeem the property. To protect Tonningsen, Tuchsen executed a mortgage for $12,500, to be delivered to Tonningsen in the event the tender was accepted. The tender was refused, so that this mortgage was never delivered, but it is significant for the reason that the mortgage did not cover the $1,000 already supposedly advanced to Tuchsen. If Tonningsen had actually parted with the $1,000 used by Tuchsen to purchase the land, and if the transfer of the land to Tuchsen by respondent corporation had been a *bona fide* transfer, it would seem likely that Tonningsen would have insisted that the proposed mortgage should cover the $1,000 already advanced as well as the $12,500 used for the tender.

Immediately after the Odd Fellows Cemetery Association had refused the tender, Tuchsen, without consideration, deeded the property to Tonningsen. The appellants contend that by these transfers respondent corporation deeded away its entire legal and equitable interests in the property. Respondents contend, and the trial court found, that the corporation retained its beneficial interest in the property but deeded the legal title to Tuchsen for the purpose of facilitating the redemption of the property, and to expedite the action that it was proposed to institute against the Odd Fellows Cemetery Association. The trial court likewise found, in effect, that Tuchsen transferred the legal title to Tonningsen, who accepted the same with knowledge of the trust and subject thereto. Whether these findings are supported by the evidence is the principal point on these appeals. We are of the opinion that the evidence supports the above findings. To hold otherwise it would be

necessary to find that Fitzpatrick, one of the attorneys of the corporation, Stoney, Patton and Tonningsen were all guilty of bad faith from the start of these transactions and that they intended to secure for Tonningsen or for Tonningsen and Patton the valuable properties of this corporation for the nominal sum of $1,000 and thus defeat he rights of the other 70-odd stockholders.

The record would not support such findings; in fact, all inferences are to the contrary. Moreover, if as appellants claim, Tuchsen purchased as a dummy for Tonningsen, and if the sale was of the equitable as well as the legal title of the corporation to the lands, then why did Tonningsen cause the mortgage for $12,500 mentioned above, to be prepared? If Tonningsen, through Tuchsen, already owned the property, the making of such a mortgage would be meaningless. ■ The trial court inferred from these and other facts that Tuchsen and Tonningsen were dummy transferees of the corporation, for the purposes outlined above, and that Tonningsen took the legal title subject to an oral trust in favor of the corporation. This inference, being reasonable and being based on conflicting evidence, cannot be disturbed on appeal.

■ It is no objection to the creation of such a trust that no writing was executed evidencing the existence of such a trust. It is true, as urged by appellants, that, under the statute of frauds, an express trust in real property must be in writing, but it is equally true that the courts will enforce an oral trust in real property, as a trust brought into existence by operation of law. (25 Cal. Jur. 159, sec. 31 et seq.) · Whether such a trust will be treated as a constructive trust or a resulting trust depends upon the circumstances. As long as the grantee accepts the land under an oral trust, and holds subject to it, he will be deemed to hold the land subject to a voluntary resulting trust in favor of the grantor. Such was the situation here.

After Tonningsen had secured the legal title to the property, as set forth above, he commenced an action against the Odd Fellows Cemetery Association to recover the property, in which he was ultimately successful, the District Court of Appeal affirming the judgment in *Tonningsen* v. *Odd Fellows Cemetery Assn.*, 60 Cal. App. 568 [213 Pac. 710]. This court denied a hearing on March 26, 1923. Shortly thereafter Tonningsen entered into a new agree-

ment with the cemetery association for the sale to them of the property along the same lines as the original contract. Under this contract Tonningsen was also paid $25,000 by the cemetery association, which sum not only included all expenses of the litigation, including attorney fees, but also included a settlement of all claims of the Golden Gate Land Association against the Odd Fellows Cemetery Association under its contract.

Patton died on April 11, 1923. Until that time, Tonningsen had apparently held the legal title subject to the trust, but upon Patton's death Tonningsen determined for the first time, apparently, to repudiate the trust and to keep the property for himself. He repudiated not only the claims of respondent corporation, but also all claims of Patton, with whom, there is documentary evidence to show, he had an agreement to share the property. Patton's representatives, therefore, brought this action. Bone then caused the Golden Gate Land Association to be once again revived, and, in 1924, the revived corporation authorized the bringing of this action on behalf of the corporation, with the result already set forth.

Appellants contend that the action is barred by the statute of limitations. This argument is based on the theory that the trust here created was an involuntary trust. Assuming, but not deciding, that an involuntary trust would be created under a similar state of facts, inasmuch as Tonningsen controlled the board of directors, and caused this board to transfer the corporate property to a dummy transferee and ultimately to himself for a nominal consideration, it would be clear that such a cause of action would be barred by the statute of limitations. In the case of such a trust, the law is well settled that the statute starts to run from the date of the transfer, no repudiation by the trustee being required in order to set the statute of limitation in motion. (*Norton* v. *Bassett*, 154 Cal. 411 [129 Am. St. Rep. 162, 97 Pac. 894] ; *Broder* v. *Conklin*, 121 Cal. 282 [53 Pac. 699] ; *Nougues* v. *Newlands*, 118 Cal. 102 [50 Pac. 386] ; *Earl* v. *Bryant*, 12 Cal. App. 553 [107 Pac. 1018].) But such is not the type of trust involved here. The trust here existing was a voluntary continuing trust, not an involuntary one. The trustee accepted the land with knowledge of and subject to the trust, and acted under it until 1923, when he first repudiated it. Under such circumstances, the law is

equally well settled that the statute of limitations does not start to run until repudiation by the trustee. (*Moss* v. *Odell,* 130 Cal. 352 [62 Pac. 555]; *Faylor* v. *Faylor,* 136 Cal. 92 [68 Pac. 482]; *Butler* v. *Hyland,* 89 Cal. 575 [26 Pac. 1108]; *Cooney* v. *Glynn,* 157 Cal. 583 [108 Pac. 506]; *Varrois* v. *Gommet,* 43 Cal. App. 756 [185 Pac. 1001].) We are, therefore, of the opinion that the action is not barred by any statute of limitations, having been commenced within a year of the repudiation by the trustee.

We have reviewed the facts in this case at some length. Many of them, it is true, are based on conflicting evidence. Some of them are based on inference from proved facts. Tonningsen testified directly contrary to many of the above facts and offered evidence contrary to some of the inferences above mentioned, but the trial court chose not to believe him. As is usual in such cases, the trial court was presented with opposed stories, opposed theories, opposed interpretations of certain acts and facts, and on such conflicting evidence found for respondent. Under such a state of the record, our well-known rule as to findings based on conflicting evidence forbids interference with the judgment.

The judgment and order appealed from are affirmed.

Rehearing denied.