[Civ. No. 13236.   First Dist., Div. One.   Apr. 15, 1947.]

J. TREAGER, as Administrator, etc., et al., Appellants, v. BEATRICE FRIEDMAN, Respondent.

Charles N. Douglas, Mueller & Westover, Jesse A. Mueller, Donahue, Richards & Hamlin and George K. Ford for Appellants.

Sullivan, Roche, Johnson & Farraher for Respondent.

BRAY, J.—Appeal from judgment for defendant in an action to quiet title to four furnished apartment houses, and

their furnishings, in San Francisco, and to require defendant to account to plaintiffs for the profit from defendant's operation of such houses.

The complaint, filed January 19, 1943, alleged that plaintiffs were the owners of four certain apartment house properties together with their furniture, furnishings, and personal property; and in the usual terms of a quiet title action, that the defendants claimed an interest in and to said real and personal property, but that such claims were without right. Frances Treager, one of the original plaintiffs, died during the proceedings, and her husband as administrator of her estate was duly substituted in her place. The defendants were Beatrice Friedman and a number of fictitious defendants. Mrs. Friedman was the only defendant sued, and from henceforward we will treat the pleadings and case as though she were the only defendant. The complaint then went on to state that defendant had been in possession of the real and personal property described since on or about December 28, 1937, and had been collecting, and still continued to collect the rents, issues and profits thereof, retaining the same and claiming without right to be the owner thereof; that said rents, issues and profits were the property of and belong to plaintiffs; that defendant refused to account, and that defendant "now hold[s] the said real and personal property hereinabove described in trust for these plaintiffs." The plaintiffs prayed that their title be quieted, that a receiver be appointed to take charge of the apartment houses and collect the rents, and that defendant be required to account for the net profits of her operation of the houses.

Defendant's answer denied that the property belonged to the plaintiffs and alleged that defendant claimed the ownership of the real and personal property in fee simple absolute; admitted that defendant had been in possession since December 28, 1937, collecting the rents, issues and profits; alleged that she intended to continue collecting the same; and claimed to be the owner thereof. The answer then set up the defense of the statute of limitations, alleging that plaintiffs' alleged cause of action was barred by the provisions of sections 318 through 326, and sections 336 (2), 337 (1), 338 (1), (2), (3), 339 (1), and 343, Code of Civil Procedure. Defendant then alleged her adverse possession for more than five years.

This answer was filed April 8, 1943. The complaint did not allege the type of trust under which it was claimed defen-

dant held the property, the date of the origin of that trust, or the date of any repudiation thereof. The defendant did not demur, but answered. On April 10, 1944, over a year after the answer was filed, in an endeavor to cure the defects in their complaint, plaintiffs moved to amend on the ground that the allegations in the complaint concerning the alleged trust "should be amplified." The court denied the motion.

Prior to the time of trial, the court on motion of defendant ordered that the affirmative separate defenses in the answer—statute of limitations and title by prescription—be tried before the trial of any other issues in the case. On these issues, after a lengthy trial (the reporter's transcript contains 2,341 pages) the court found for defendant on each of the affirmative separate defenses and entered judgment accordingly. At the trial, plaintiffs renewed their motion for leave to file an amended complaint, which motion the court, although at one time intimating that it should be granted, finally denied. Plaintiffs claim on appeal that the court erred in denying their motions to amend, but say in their opening brief, "These motions probably become important only if the issues made by the complaint and answer, other than the affirmative separate defenses, are hereafter tried."

This litigation grew out of the purchase at foreclosure sale by defendant of the property above mentioned, under a deed of trust and chattel mortgage executed by Dr. Aaron Friedman to his brothers and sisters, the plaintiffs, and a deed of trust and chattel mortgage executed by another brother, Joseph Friedman, to two of the plaintiffs, Isaac and Abe Friedman. At the time of the foreclosure sale, defendant, who was then known by her maiden name, bid in the properties under the name "B. Silverman," the latter being her former married name. About eleven months after the sale defendant married Dr. Friedman, who died November 29, 1940.

Plaintiffs contend that the deeds of trust and chattel mortgages were given by Dr. Friedman and by Joseph Friedman to them to secure bona fide debts owed them, and that when defendant bid the property in at the foreclosure sale, she paid no money but used the credit of the indebtedness which the instruments secured; that thereby a resulting trust was created under which defendant held the property for them, which trust she did not repudiate prior to March 14, 1942 (less than a year before the suit was filed), and hence that

no statute of limitations could apply, and there could be no prescriptive title.

It was defendant's position that with the exception of $27,000 which Dr. Friedman admittedly owed to plaintiffs Abe and Isaac Friedman, doing business as Friedman Brothers Glass Company, the entire debt set forth in the instruments was fictitious, and that the deeds of trust and chattel mortgages were made to protect Dr. Friedman and Joseph Friedman against the claims of a certain creditor of theirs. In other words, defendant claimed that the encumbrances were fake to protect them against the claims of another; that when she purchased at the foreclosure sale she was acting under the instructions of Dr. Friedman; that while she paid no moneys and used the credit of the apparent debt, there actually was no indebtedness and the foreclosure sale was merely for the purpose of getting the title into her to be held for herself; and that from the day of the foreclosure sale on she held the title and the properties adversely against all the plaintiffs.

The trial court found in accordance with the contention of the defendant, after a lengthy trial in which there was a definite conflict of testimony. Because there was no conflict as to certain important facts, plaintiffs take the position that the ''conflict of testimony'' rule does not apply, and that as a matter of law the court from such facts should have found that defendant held under a resulting trust. Before discussing this contention, it will be well to set forth the facts of the case. It is impracticable, due to the voluminous amount of evidence adduced, to set it all out here, but the main portions of the evidence will be discussed.

Disregarding all conflicts in the evidence and giving the evidence of defendant the weight to which it is entitled in an appellate court, an examination of the evidence confirms the findings of the trial court and shows the following to be the situation:

Prior to 1933, Joseph Friedman, a brother of plaintiffs and of Dr. Friedman, had given to one Palmer and his associates (hereinafter referred to as the Palmers) a promissory note for $65,000, secured by a deed of trust on certain Mission Street property. Dr. Friedman had endorsed this note. The note was not paid, and the attorneys for the Palmers made demand upon Joseph Friedman as maker and Dr. Friedman as endorser, for payment of the note. It not being paid,

the preliminary legal steps were taken so that on May 10, 1933, notice of default and election to sell under the deed of trust was given. Dr. Friedman and Joseph Friedman became afraid that a deficiency judgment would result against them and that they would lose all their property. At that time Dr. Friedman owned the four apartment houses in question here and their furnishings.

To protect his properties against any claim of the Palmers, Dr. Friedman prepared the following documents, all dated August 17, 1933:

(1)  A deed of trust covering the four apartment house properties, to Anglo California Bank as trustee, to secure a total purported indebtedness of $105,632.73, to the following persons in the following amounts:

Plaintiff Frances Treager, $20,170.67, with interest from August 15, 1933;

Plaintiffs Isaac Friedman and Abe Friedman, doing business as Friedman Brothers Glass Company, $27,000, without interest;

Plaintiff Sarah Stoff, $58,462.06, with interest from August 15, 1933.

(2)  Chattel mortgages covering the furnishings of the four apartment houses to the same persons, to cover the same purported indebtedness.

(3)  A pledge of 150 shares of stock of Sidley Company, a corporation, to the same persons to secure the same purported indebtedness.

(4)  A pledge of 280 shares of stock of Sidley Company to the same persons and for the same purposes.

It is interesting to note that there was no promissory note accompanying, nor secured by these instruments, nor was there any due date for principal or interest mentioned in any of the instruments.

On the same day, Joseph Freidman, whose note Dr. Friedman had endorsed, executed the following documents:

(1)  Deed of trust to Anglo California Bank as trustee and plaintiffs Isaac Friedman and Abe Friedman, as beneficiaries, to secure a purported indebtedness of $8,500, covering the Cole Street property, which was one of the four properties described in the Dr. Friedman deed of trust and in the complaint here.

(2) Chattel mortgage to Friedman Brothers covering (a) furnishings of the Cole Street apartments; and (b) the equipment of the bottling works owned by Joseph Friedman.

That these encumbrances executed by Dr. Friedman and Joseph Friedman were to protect the property of both of them from a possible Palmer deficiency judgment cannot be doubted. Among other things, plaintiff Abe Friedman testified that when Dr. Friedman brought the deed of trust to Friedman Brothers he indicated that he was in financial difficulties; that Dr. Friedman initiated the idea of the deed of trust and brought out the chattel mortgages for Abe and Isaac to sign. Plaintiff Isaac Friedman testified that he did not discuss the deed of trust with Dr. Friedman prior to its preparation, and that Dr. Friedman "took care of all of it." Plaintiff Sarah Stoff in her deposition testified that at the time the deed of trust was made, she knew there had been a threat of foreclosure of the Mission Street property belonging to her brother Joseph, and that was the reason for the deed of trust. At the trial she repudiated this testimony. As to the mortgages plaintiff Abe Friedman testified it was "Just a passing event . . . we weren't interested in that." Plaintiff Isaac Friedman testified that he did not know that Friedman Brothers had taken the chattel mortgage made by Joseph Friedman to Friedman Brothers. It is also apparent from his testimony that he knew nothing about the deed of trust made to him and Abe covering the Cole Street property. Plaintiff Sarah Stoff testified that she did not remember ever signing the mortgages, although she actually did sign as mortgagee.

As to the pledge of the Sidley stock, plaintiff Abe Friedman testified that he made no investigation of it, that "that was his [Dr. Friedman's] baby." Plaintiff Isaac Friedman said he never saw the pledge before the trial, did not recall it ever having been mentioned, and never knew that Friedman Brothers ever had any interest in the Sidley Company. Plaintiff Sarah Stoff testified that she never saw the pledge.

Attorney Harry S. Young testified that he prepared the deeds of trust and the chattel mortgages at Dr. Friedman's request, receiving the particulars from Dr. Friedman. He mailed the deeds of trust, the chattel mortgages and pledges and also the Joseph Friedman deed of trust and chattel mortgage to Dr. Friedman with instructions as to how these were to be signed.

All plaintiffs concede that Dr. Friedman determined the amounts of the purported debts which should be inserted in the instruments. None of plaintiffs went over them. Plaintiff Sarah Stoff testified that she did not know whether her claim was $50,000 or $70,000.

When Dr. Friedman was preparing the figures to give to Attorney Young for preparation of the encumbrances, he told defendant "figures were very funny things, that you could make them say almost anything you wanted them to say." He first made out a list which included the amounts stated in the deeds of trust plus $11,219.90 as an alleged indebtedness to his sister Belle Friedman. This made a total indebtedness of $116,852.62. He then scratched out the Belle Friedman amount, thereby arriving at the $105,632.73, the figure in the deeds of trust as executed. At that time Dr. Friedman owed Belle nothing as he had already repaid her $11,000 which he had at one time borrowed from her.

After the foreclosure sale at which defendant obtained title, a suit was brought on behalf of the Palmers to set aside the trust deed and sale on the grounds that they were fraudulent. A few days before the trial in that action Dr. Friedman phoned plaintiff Sarah Stoff to come to his office so that he could show her "how he figured out the family's interests." He dictated the figures and she wrote them down, and he said, "Now you do this and you give this one to Frances and you take this one for yourself to be sure that these are your interests and you know that these are your interests." Sarah did not attend the trial. The testimony indicates that she kept out of sight. Dr. Friedman did attend the Palmer trial and testified to the figures, but was thereafter worried that the Palmers might go further with the matter. A few days after he testified, that case was settled.

Plaintiff Sarah Stoff's testimony as to the purported indebtedness of $58,462.06 (stated in the trust deeds, chattel mortgages and pledges) is very confusing and not convincing. From 1908 to 1918, she was employed as a saleswoman. In 1918, she had to give up work due to an injury. After 1918, she spent considerable time in rest homes, in one for a period of two years. She did not adequately explain where she got the money to loan her brother. As to $12,500 of the amount, she first said that her father gave that sum to her when he passed away. But plaintiff Isaac Friedman testified that Sarah received only $1,500 from that source, and that she drew it out at $75 per month and had but $365 coming on

distribution of his estate. Then she stated that Isaac and Abe put up the $12,500 because she was sick and they wanted to take care of her. She did not know whether they gave or loaned it to her. Plaintiff Isaac Friedman testified that the $12,500 was a gift from her six brothers, including Dr. Friedman.

At one time plaintiff Sarah Stoff testified that the Sacramento Street property, which was exchanged for the Frederick Street property (one of the four apartment properties involved here) was held by her in trust for the family, but not including Dr. Friedman. Then she stated that it belonged to her, and finally that Dr. Friedman owned it and she owned no interest in it. In her deposition she testified that she did not loan any moneys to Dr. Friedman. On the trial she testified that she did. At one time she claimed to have given him $2,354.93 to be put into the purchase price of one of the properties. Her bank account at that time shows no withdrawal of any such sum. Dr. Friedman's bank account shows the withdrawal of that amount which with the $10,000 from Belle Friedman went into the purchase price of that property. This $10,000 Dr. Friedman paid back to Belle in monthly instalments.

The Palmers sold the Mission Street property (under the trust deed of Joseph Friedman) on May 28, 1934, leaving a deficiency of over $28,000. June 9, 1934, they sued Dr. Friedman and Joseph Friedman and wife for this deficiency, obtaining judgment on November 7, 1935. Dr. Friedman was busy covering up. While the notice of foreclosure sale was running and on May 24, 1934 (four days before the Palmer foreclosure sale took place), Dr. Friedman had the bank accounts covering the four apartment houses transferred to plaintiff Sarah Stoff's name, giving as an excuse, according to Sarah, that he had been dabbling in property with certain men. Dr. Friedman also transferred to plaintiff Sarah Stoff a claim for over $26,000 against one Barron and then had her assign it to an employee in Attorney Young's office. Sarah testified that she had no recollection of any claim against Barron, that Dr. Friedman never spoke to her about it, and she did not remember the assignment. Dr. Friedman even transferred his automobile into Sarah's name. She did not have ''any recollection of that at all.'' However, Dr. Friedman continued to operate the car.

Joe Friedman was also continuing to cover up. On June 12, 1936, Joe gave Friedman Brothers a chattel mortgage on

his four automobile trucks, purporting to secure the same money with interest covered by the trust deed given them in 1933. Joe also pledged to plaintiff Abe Friedman his shares of Magnavox stock. Abe, when asked about this, practically admitted that it was done for the purpose of preventing any levy on the stock by the Palmers.

The foreclosure of the encumbrances given by Dr. Friedman to plaintiffs and by Joe to Friedman Brothers was brought about by Dr. Friedman. He arranged to have his attorney, Harry Young, take the necessary steps for foreclosure, and he paid the costs and attorneys' fees. The sale was first set for August, 1937, but had to be called off and a new date given because the notice of sale had not been served on the Palmers. The sale of the pledge of the Sidley stock was not postponed. On July 2, 1937, all of the plaintiffs signed a notice of sale under the pledge. Plaintiff Sarah Stoff testified that she never read the notice; that when Dr. Friedman came with anything for her to sign, she signed it. The next day all the other plaintiffs signed an assignment of all their interest in the pledge of this stock to Sarah. She testified she did not remember the incident. The certificate of sale under the pledge shows the stock as being sold to the plaintiffs for $10,000, credited as follows: Plaintiff Frances Treager, $1,889.86; Isaac Friedman and Abe Friedman doing business as Friedman Brothers, $2,530.44; Sarah Stoff, $5,474.70. Sarah testified that she never got the money. If the sale was bona fide, Dr. Friedman should have received credit on his purported indebtedness to each plaintiff in the amount set forth, and the plaintiffs would have been the owners of the stock.

Abe Friedman testified that Friedman Brothers never claimed any interest in Sidley Company; that that was the doctor's business and Abe did not pay any attention to the sale, as irrespective of the foreclosure, he considered the stock the doctor's property and that "we" did not claim any interest in it. Isaac's testimony indicates that he knew nothing of the doctor's pledge, or its assignment, stating that he never read the papers his brother Dr. Friedman brought to him to sign. He stated that Friedman Brothers did not claim any interest in Sidley Company. Friedman Brothers gave no credit on their books to Dr. Friedman for the $2,530.44 credited to them out of the proceeds of the pledge sale. Sarah likewise claimed no interest in Sidley Company or in its stock.

Although the Sidley Company stock was bid in in the names of the plaintiffs, and the interest of Dr. Friedman purportedly

sold out, Dr. Friedman thereafter continued to exercise ownership of it. He had purportedly pledged the Sidley Company stock, but thereafter, in June, 1936, he had a contract drawn up between Sarah Stoff, Sidley Company, and himself, together with a form of resolution for Sidley Company directors to adopt. The contract and resolution stated that Sarah Stoff had paid Sidley Company $28,078.81, of which $9,981.95 had been applied on stock, and that 278 shares in the name of Dr. Friedman were being transferred to her as her absolute property. On the envelope in which the agreement and resolution were submitted to Dr. Friedman he wrote ''Agreement nullified by certificate of sale July 9, 1937.'' Sarah testified that she was positive that she never put any money in or loaned any money to Sidley Company. Because of labor troubles in the operation of its business, the corporation was dissolved after Dr. Friedman's death. Defendant as administratrix of his estate sold all of the property formerly owned by the corporation, consisting of merchandise, machinery, name, patent rights, patterns, etc.

The situation with reference to the Sidley stock is informative. Although bid in at the pledge sale in the names of the plaintiffs, none of them ever claimed nor do they now claim any interest in it, or the moneys which came from the dissolution of the corporation. It is obvious that the four apartment houses and their furnishings are in the same category as the Sidley stock. All were given as security for the ''real'' $27,000 debt to Friedman Brothers (hereinafter more particularly discussed), and the fictitious debts to Sarah Stoff and Frances Treager, and it was never anticipated that any interest in or claim to these properties should ever come into being in favor of plaintiffs.

Other loans on the properties, ahead of the plaintiffs' trust deed, were coming due, and Dr. Friedman came to Abe and Isaac and told them that a foreclosure would have to be held because of need of refinancing. None of the plaintiffs ever requested or ordered the foreclosure sale, and neither Isaac nor Sarah knew of the call for a sale in August.

December 27, 1937, was selected by Dr. Friedman and his attorney for the sale. Abe testified that Dr. Friedman figured the amounts of the bid to be made on the foreclosure sale. Dr. Friedman told defendant that he was fixing the bid high enough so that if the Palmers wanted the property they would

have to pay for it. Isaac testified that the foreclosures were had for the purpose of refinancing. None of the plaintiffs ever discussed with Dr. Friedman or defendant the amount which defendant was to bid for the properties, except that Isaac was present in Attorney Young's office when Dr. Friedman instructed her the amount to bid. Sarah was surprised to hear of the foreclosure sale, although she testified she did not know whether she heard about it before or after it took place. Dr. Friedman told defendant that he wished her to bid in the properties for her own account since they were about to be married and he wanted her to have the properties; that he did not want them to fall into the Palmers' hands; that together they could handle the properties and make something out of them. After the sale, Dr. Friedman told defendant that he did not need to make a will or take out life insurance because she already had the properties. To keep the Palmers from learning that it was Dr. Friedman's fiancee who bid at the foreclosure sale he instructed her not to bid in her maiden name, by which she was generally known, but to bid in her former married name, "B. Silverman." Sarah Stoff testified that when she heard that B. Silverman had bid in the properties she did not know who B. Silverman was. The attorney for Palmer told defendant that he had difficulty in finding out who the bidder was and was amazed to learn that B. Silverman was not a man. Apparently plaintiffs thought that the indebtedness against the property (other than the fictitious $105,632.73) was all it was worth as the family told Dr. Friedman he was foolish trying to save it.

Defendant bid in all the real and personal properties covered by the trust deeds and the chattel mortgages. The Sidley stock was bid in the name of Friedman Brothers, Sarah Stoff and Frances Treager, and the equipment of Joseph Friedman's water business was bid in in the name of Friedman Brothers. Joe continued to run his water business until he sold it out in 1942, and Friedman Brothers claimed no rights in it at any time, nor did they carry it on their books as part of their assets. When asked if it was not a fact that the giving of the chattel mortgage on Joe's water company equipment and its foreclosure and sale were "for the purpose of preventing his creditors, including Palmer and his associates, from enforcing any claim or judgment against Joe Friedman," Abe replied, "I don't know whether it is or not." Joe's indebtedness to Friedman Brothers was carried on their books of account

until it was written off as a bad debt in January, 1944, and deducted as such in their income tax report.

The Barron claim which had been assigned to Sarah Stoff was compromised for $7,000 paid by Barron to Dr. Friedman. No part of this money was ever received or claimed by Sarah.

Defendant freely admits that her husband, Dr. Friedman, did owe $27,000 to Friedman Brothers. But the evidence shows and the court found that this indebtedness was never used by her as a credit on the $99,500 she bid for the properties at the execution sale. Had it been so used then Dr. Friedman would have no longer owed that sum to Friedman Brothers. Yet the testimony of Friedman Brothers' bookkeeper shows that this same $27,000 was carried on their books unchanged from 1931, except that in 1943, the balance was shown on the books as $26,992.40 and as owing from defendant instead of Dr. Friedman. $20,000 of this indebtedness originally had been borrowed by Isaac Friedman from the Anglo bank and turned over to Dr. Friedman. Thereafter Dr. Friedman paid the interest to the bank. After his death, defendant paid the interest up until the commencement of this suit, and even paid a part of the principal. The claim that the $27,000 was a credit on the foreclosure sale purchase price is not consistent with the fact that defendant paid and Friedman Brothers accepted payment from her thereafter of interest and a portion of the principal. The Friedman Brothers' books showed no security for this debt, and in January, 1944, the $26,992.40 was written off as a bad debt and deducted as such on the 1943 income tax return of Friedman Brothers. In 1944, the Friedman Brothers partnership was dissolved and this debt, charged to "Beatrice Friedman," was divided half to Isaac and half to Abe. The bookkeeper testified that he considered the account as still owing from Dr. Friedman's estate. The fact that it is still shown as a debt due from either defendant or Dr. Friedman's estate is strong evidence that it had not been used by defendant as a "credit" on her bid at the foreclosure sale. Again, the books of Friedman Brothers nowhere show any claim of interest in the four properties, although they do show other apartment houses in which the partnership held interests. If defendant were holding any interest in these properties in trust for Friedman Brothers, it seems unreasonable that their books do not show some evidence of it. Again, it is significant that in all the financial statements made by Friedman Brothers to banks from time to time from 1933

to 1944, in which they listed their assets, no reference was ever made to the deeds of trust or chattel mortgages, nor to any claimed interest in the properties. On a statement given by Friedman Brothers to the Anglo bank the Dr. Friedman indebtedness of $27,000 is noted. One of the bank officials wrote on the statement concerning this item, the following: "June 30, 1934, April 1931 for note given to Anglo by Friedman Bros., account of Dr. A. Friedman. No note has been given to Friedman Bros. to secure this indebtedness. I am informed certain real estate assignments, unavailable for inspection, were made by Dr. A. Friedman to the company. These assignments were principally, however, to protect Dr. A. Friedman in legal proceedings."

A year and a half after the execution of the trust deed, a financial statement of Dr. Friedman reciting his indebtedness to Friedman Brothers lists the four properties as belonging to him, and gives the bank loans as the only encumbrances.

It is clear that prior to this action, the plaintiffs did not claim that defendant was holding the properties as their trustee. Take the Frederick Street property, for example. Defendant bid it in (with the other properties) on December 27, 1937. It required financing almost immediately. There was a prior trust deed on it securing an indebtedness of $43,500. Plaintiff Sarah Stoff and her husband had signed the note and deed of trust. To enable the refinancing, defendant deeded this property to Sarah. Sarah and her husband executed the new note and deed of trust, renewing the loan. They then conveyed the property to the City Title Company under a holding agreement. Shortly after Dr. Friedman's death, and in January, 1941, Sarah and her husband went to the office of Albert Axelrod, who was the attorney for Mr. Stoff and also for the Dr. Friedman estate. In the presence of Sarah, Mr. Stoff told Attorney Axelrod that Sarah did not own the Frederick Street property and that it was confusing the income tax returns of himself and wife, and they wanted the attorney to prepare instructions to the title company to deed the property to defendant, who owned it. Thereupon Axelrod prepared a letter of instructions to that effect, directed to the title company, and both Stoffs signed it. The title company then conveyed the title to defendant.

Shortly after acquiring the properties, defendant refinanced the Ellis Street and Cole Street properties, going on the note

herself; and the Jackson Street property, she and her husband going on this note. In March, 1942, there was a bad fire at the Frederick Street apartments, just after defendant had finished refurnishing and renovating the building. Defendant made the necessary proofs of loss and collected the $8,100 paid by the fire insurance company for the damage done by the fire. Defendant alone contracted for the necessary repairs. On March 25, 1938, defendant signed and filed a third party claim in one of the Palmer suits, claiming as owner all the personal property in the Cole Street apartments.

Abe Friedman testified that in February, 1940, over two years after the sale to defendant, when the Jackson Street property was being financed, he was not claiming any ownership in it, and that in the period between December, 1937, and August, 1938 (which period was after the sale to defendant), he had no interest in the Cole Street property, except "by way of a loan."

At the trial, Sarah testified that she claimed no interest in the Cole Street property nor in the rents from it. It is impossible to reconcile this testimony with plaintiffs' claim that in bidding in the properties (of which the Cole Street property was one) defendant was acting as a "dummy" for plaintiffs, for if this were true, then Sarah would necessarily have a $\frac{58,462.06}{105,632.73}$ interest in the Cole Street property.

Frances Treager having died prior to the time of the trial, no testimony was available from her. However, there is no evidence that she ever asserted any claim to the properties; in fact, the evidence is to the contrary. Moreover, in 1943, Friedman Brothers, in an income tax return, deducted as a bad debt the sum of $716.30 owing them from Frances. This fact, although of minor importance, is inconsistent with the claim that at that time she owned $\frac{20,170.67}{105,632.73}$ of the four apartment houses and contents. Frances owned a one-third interest in an apartment house in which her brothers Abe and Isaac each owned a third. It is significant that their interest in this apartment house was carried on the Friedman Brothers' books, while the four apartment houses here in question were not even mentioned.

During the five years which elapsed from the purchase by defendant at the foreclosure sale until the filing of this suit, none of the plaintiffs evidenced any interest in the properties

nor in the care being taken of them by defendant. The properties were heavily encumbered; the total indebtedness against the several properties amounted to over $257,000 (not counting the purported indebtedness to plaintiffs); the annual taxes were over $8,500; there was over $18,000 per year interest to pay; there were many vacancies; the furnishings needed replenishing; and altogether the defendant had a difficult time in operating them and in paying taxes, expenses and interest. The plaintiffs admit that they did not assist defendant in arranging for refinancing, and none of them ever asked defendant for an accounting or for any information concerning her management of what they now claim is their property, or whether or not it was making or losing money.

Defendant testified that all of the plaintiffs told her that she was foolish in trying to protect the property, and that in so doing she was merely working for the banks.

Plaintiffs had the burden of establishing their claimed resulting trust "by clear and convincing evidence." (*Gomez v. Cecena*, 15 Cal.2d 363, 367 [101 P.2d 474].) Plaintiffs rely for their claim of resulting trust on the fact that in bidding $99,500 at the foreclosure sale defendant paid no money. It is undisputed that defendant put up no money for her purchase at the foreclosure sale. She bid the sum of $99,500 under the deed of trust of Dr. Friedman to the Anglo California Bank with plaintiffs as beneficiary, which sum was apparently credited against the $105,000 original indebtedness. She also bid $10,000 on the foreclosure of the Joe Friedman deed of trust on the Cole Street property. While plaintiffs' brief claims that there was an agreement entered into between plaintiffs and defendant at a meeting in Attorney Young's office that defendant was to act as "dummy" for plaintiffs, there is no evidence to support that contention. Isaac Friedman, who was the only one of the plaintiffs at that meeting, did not testify to any such agreement. Isaac testified that nothing was said about bids or the amount of money to be bid, and in his deposition in referring to defendant said, "I never knew the woman at that particular time. Just casually, that is all." Abe testified that he did not know defendant prior to the foreclosure sale. The testimony of the lawyers there present and the defendant shows that Dr. Friedman made all the arrangements, and fixed the amount which defendant should bid, and that Dr. Friedman

wanted her to bid the property for herself. There can be no question but that the foreclosure sale was merely a device figured out by Dr. Friedman as part of his scheme to protect his property and that of Joe Friedman against possible claims of the Palmers, by which he could get rid of the fraudulent trust deeds and chattel mortgages and get the title to the property in his fiancee, who would hold it for him and her. The credit of the $99,500 and the $10,000 was merely a paper transaction on a fictitious debt. The testimony does not support the plaintiffs' claim that defendant was "dummy" for them in the transaction. Abe testified, referring to the fact that as a result of the foreclosure sale defendant was the title holder of the properties—"I didn't know why she was there in the first place. I never could figure it out." Nor does the evidence support their claim that Dr. Friedman was indebted to them as set forth in the trust deed, nor that any indebtedness was used by defendant in buying the property. All of the indebtedness in the encumbrance was fictitious, excepting the $27,000 due Friedman Brothers, which sum, however, while thrown into the deed of trust by Dr. Friedman as further protection against the Palmers, was never considered by any of the parties as secured by said deed of trust or the properties described in it.

The mere fact that defendant paid no money for the properties but bid in a sum apparently credited on the alleged indebtedness to plaintiffs, does not establish, as claimed by plaintiffs, that defendant was buying them in trust for plaintiffs. While from that fact alone, a presumption might arise to that effect, such presumption may be rebutted by proof to the contrary. In determining the facts the court is not bound to credit the testimony of the parties claiming such trust, and the conduct of the parties subsequent to the claimed establishment of the trust should be considered. (*Gomez* v. *Cecena, supra* [15 Cal.2d 363, 367].) In *Lezinsky* v. *Mason Malt W. D. Co.*, 185 Cal. 240, the following is said at page 251 [196 P. 884] : "A resulting trust is not founded on the simple fact that money or property of one has been used by another to purchase property. It is founded on a relationship between the two, on the fact that as between them, consciously and intentionally, one has advanced the consideration wherewith to make a purchase in the name of the other. The trust arises because it is the natural presump-

tion in such a case that it was their intention that the ostensible purchaser should acquire and hold the property for the one with whose means it was acquired. *But this presumption is rebuttable, and, if the evidence or the circumstances show that such intention did not exist, no trust arises."* (Emphasis added.)

So, then, even if the evidence herein showed incontrovertibly—which it certainly does not—that Dr. Friedman was actually indebted to all of the plaintiffs in the sums set out in the various securities, and that defendant actually used those credits of plaintiffs to bid in the property, it would seem that the inference or presumption that a resulting trust was created might be successfully rebutted by the plentitude of evidence to illustrate that the complete transaction, from beginning to end, was only part of the machinations of Dr. Friedman to hinder the Palmers, and that it was not, in the language of the Lezinsky case, *supra,* "consciously and intentionally" meant that plaintiffs were actually to acquire any type of beneficial interest in the properties.

Plaintiffs claimed that the court erred in applying the statute of limitations and finding that defendant had acquired title by adverse possession. They claim that adverse possession could not lie because there was no repudiation of the resulting trust which they claimed existed until less than five years before suit, and cite 1 Cal.Jur. 539, § 31, n. 7-8, and *Leviston* v. *Tonningsen,* 212 Cal. 656 [299 P. 724], to the effect that a trustee's possession is not adverse to the beneficiary until there is a repudiation of the trust, or a violation of the trust. Of course, the court found, and properly so under the testimony, that there was no trust; therefore the statute began to run the moment defendant took title and possession.

But assuming that from the mere circumstance that defendant paid no money, but used merely a credit on the deed of trust in buying the properties, a resulting trust was created, the evidence shows that immediately upon taking possession defendant treated the property as her own (or at least as hers and Dr. Friedman's), that she collected the income, paid all expenses, arranged for all financing, never accounted in any manner for her management of the properties, and that the plaintiffs at all times knew that she was so doing and never during the prescriptive period ever claimed the property as their own.

"For the purpose of constituting an adverse possession . . . founded upon a written instrument . . . land is deemed to have been possessed and occupied in the following cases: . . . (3) Where . . . it has been used . . . for the ordinary use of the occupant." (Code Civ. Proc., § 323.) In *Posey* v. *Bay Point Realty Co.*, 214 Cal. 708 [7 P.2d 1020], it was held that where property is adversely claimed under a written instrument, the above quoted requirement for the "ordinary use of the occupant" means such use may be made of the property as is appropriate to the location and character of the property, and that each case must stand upon its own peculiar facts. Defendant's acts in assuming full and exclusive authority in renting and operating the four apartment houses and in dealing with them without regard to plaintiffs is a use appropriate to the location and character of the property.

Defendant paid the taxes over that period. It is true that the checks for about three years' taxes were signed by plaintiff Sarah Stoff. But the evidence demonstrates that Sarah Stoff was merely holding the bank account in her name as another covering up of Dr. Friedman. She never made out any checks, but either signed them in blank or signed such filled out checks as Dr. Friedman presented to her. She signed as many as fifty to seventy-five blank checks at a time. She had no interest in these bank accounts which Dr. Friedman put in her name, had none of her own money in them, and never drew any money out of them. While the money which went into the bank account and with which the taxes were paid came from the income from the properties, it was clear that defendant and Dr. Friedman were claiming these moneys for their own and they actually were their own. Shortly after Dr. Friedman's death, these bank accounts in Sarah's name were closed out and transferred to defendant.

Dr. Friedman also transferred to Sarah his Sidley Company accounts and had her sign the checks therefor, a fact which Sarah at first did not remember because "Sidley transactions never registered in my mind at all." He also placed in her name the bank account of the Lassen Shop in which he was interested, another transaction Sarah did not remember too well. She admitted that she never had any interest in the Lassen Shop or its moneys. She signed checks for both these accounts whenever asked by Dr. Friedman so to do.

█ Plaintiffs lay great stress upon the fact that defendant for the four years following her purchase of the properties made fiduciary income tax returns to the federal government. As the plaintiffs did not know that she was doing so, such a fact does not render defendant's claim to the property less open, notorious or exclusive. The title of the returns was "B. Silverman Trust," and in 1938 and 1939 were made out by Dr. Friedman, evidently pursuant to his plan of covering up. These covered only three of the properties. Mrs. Stoff during the same two years was making a personal income tax return on one of the properties, the Frederick Street apartments, although she claimed no interest in it. These likewise were prepared by Dr. Friedman. The 1939 return covered all the properties, was prepared by Dr. Friedman, and showed that Sarah Stoff had been paid $1,500 as beneficiary. Sarah had not received that amount, or any other amount, and did not claim to be entitled to it.

When defendant came to make a return for 1940, she consulted an accountant, telling him that she owned the property and wanted to file returns in her own name. He told her to consult an attorney, but in the meantime to follow her husband's example. For 1940 and 1941, he made out for defendant a fiduciary return covering three of the properties. Plaintiffs claim that because of the fact that the 1941 fiduciary return was signed by defendant March 14, 1942, there could have been no repudiation of the trust prior to that date. But, these returns were a continuation of Dr. Friedman's scheme of covering up, and probably for some reason between the taxpayer and his government. They were unknown to plaintiffs, and therefore did not interrupt the adverse claim which defendant made to the properties from the very moment of her bidding them in, which adverse claim the evidence shows and the court specifically found to have been known to plaintiffs. It must be remembered that in their sworn complaint, plaintiffs alleged that the date when defendant took possession adversely to them was December 28, 1937, the same date that defendant claims and the court found. Even though their complaint were to be amended, this statement would still be an admission against them.

Plaintiffs quote Civil Code, section 853: "When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is

made.'' But the evidence here shows that the consideration for the purchase by defendant under the deeds of trust was not paid for by the plaintiffs, nor in fact that any actual consideration was paid. It was merely a paper transaction apparently crediting money on what was a nonexistent debt.

Plaintiffs also quote from *Viner* v. *Untrecht*, 26 Cal.2d 261 [158 P.2d 3], to the effect that where the elements of a resulting trust are present, the fact that an oral agreement made by the parties that the transferee merely held the property in trust was in violation of the statute of frauds, does not prevent such a resulting trust from arising. However, that rule of law is not applicable for the reasons, first, that the evidence fails to disclose that there were elements of a resulting trust present, and secondly, that there was no oral agreement between plaintiffs and defendant that the property would be held in trust for the plaintiffs.

In view of our determination that the trial court was justified under the evidence in finding in favor of the defendant upon the special issues tried, it becomes unnecessary to pass upon the court's rulings denying plaintiffs permission to file an amended complaint. The bar of the statute of limitations and the determination that defendant has acquired title by adverse possession, eliminate the possibility of another trial and hence the necessity under any theory of an amended complaint.

Upon this question of amendment it is interesting to note the grounds upon which the court denied permission to file the proposed pleadings. As to the amended complaint first proposed, the court found, first, that over fifteen months had elapsed between the filing of the original complaint and the filing of the motion to amend, and that ''no excuse has been made or offered or appears for the aforesaid delay''; secondly, that the reason given by plaintiffs for asking permission to amend ''is sham and is not the real or true reason''; thirdly, that the plaintiffs did not advise the court of the fact that the important date ''December 28, 1937'' set forth in the original complaint was changed in the proposed amended complaint to ''June 5, 1942'' and that this change was attempted without any claim that the first date was inserted through mistake or inadvertence; that plaintiffs ''have given no explanation whatsoever concerning the reason for changing'' said dates; fourthly, that the affidavit of one of the plaintiffs filed in support of the motion ''is sham''; fifthly,

that the real reason plaintiffs desired to file the amended complaint "is merely to avoid the Statute of Limitations and the other defensive matters" pleaded in defendant's answer; sixthly, that neither the motion nor the proposed pleading was offered or made in good faith; and seventhly, that permitting the amendment "would not be in furtherance of justice, but would, on the contrary, be subversive of justice."

The second proposed amended complaint alleged that defendant agreed with plaintiffs to buy in the properties at the foreclosure sales and to hold the legal title to such properties as trustee of a resulting trust for plaintiffs. The court in the findings of fact, gave as the reason for denying permission to file the proposed amended complaint that "The evidence fails to establish any such agreement so sought to be pleaded. The evidence does establish, and this Court finds, that there was not any such agreement as alleged in said tendered amended complaint." The proposed pleading also changed the date when defendant started to claim adversely to plaintiffs from December 28, 1937, as alleged in the original complaint, to June 5, 1942. The court gave as another reason for denying permission to amend, the fact that it found that the evidence established December 28, 1937, as the correct date. This proposed pleading was offered "to conform to the proof." The court found that it not only did not conform to the proof, but·was actually contrary to it. While the case was tried on the issues presented by the special defenses, all the evidence which could have been introduced under the proposed amended complaint was actually heard and considered. In fact, plaintiffs' main contention is that the evidence established a resulting trust. The court on the evidence found that there was no such trust as plaintiffs were attempting to plead.

██ Moreover, there is substantial authority to the effect that a party will not be allowed to file an amendment contradicting an admission made in his original pleadings. (31 Cyc. 422; *Bank of Woodland* v. *Heron,* 122 Cal. 107 [54 P. 537]; *Tognazzi* v. *Wilhelm,* 6 Cal.2d 123 [56 P.2d 1227].)

Also we have not considered defendant's contention that by pleading in their complaint that defendant had been in possession adverse to them since December 28, 1937, plaintiffs had "pleaded themselves out of court" for the reason that we have determined the case from the evidence. Of course, as evidentiary matter, that allegation may be considered as an admission against interest. This appeal is being determined upon the merits rather than upon a question of pleading.

It is obvious that the original transactions between Dr. Friedman and the plaintiffs were in fraud of a creditor. Neither at the trial nor in the briefs on appeal, was this issue of fraud, or that the parties did not come into court with clean hands, raised. Were they to be applied here, plaintiffs could gain no comfort from them, as the court would leave the property and the parties where it finds them, which necessarily would mean denying plaintiffs any relief. As to the affirmative action of the court in quieting defendant's title, such action is based, not upon the original transactions, but upon the adverse possession of defendant for the statutory period, which created a new title. For that reason the so-called "clean hands" doctrine does not apply. As stated in *Carman* v. *Athearn*, 77 Cal.App.2d 585, at page 598 [175 P.2d 926] : ''The misconduct which brings the 'clean hands' doctrine into operation must relate directly to the transaction concerning which complaint is made. The misconduct must infect the cause of action before the court. Relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court. A party may have relief in connection with a transaction itself untainted although his original title may have been tainted by improper conduct. These principles are well settled. (See *Germo Mfg. Co.* v. *McClellan*, 107 Cal.App. 532 [290 P. 534] ; *Bradley Co.* v. *Bradley*, 165 Cal. 237 [131 P. 750] ; *Western Union Tel. Co.* v. *Commercial Pac. C. Co.*, 177 Cal. 577 [171 P. 317] ; 2 Pomeroy's Equity Jurisprudence (5th ed.), p. 94, § 399 ; cases collected 30 C.J.S. p. 491, § 98(c) ; 4 A.L.R. 44 at p. 65.)'' As to the conduct of defendant during the prescriptive period, it was in no way tainted with any inequitable or improper conduct.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied May 15, 1947, and appellants' petition for a hearing by the Supreme Court was denied June 12, 1947. Carter, J., voted for a hearing.