[S.F. No. 22671. In Bank. Apr. 20, 1970.]

ADOLFO MAJEWSKY et al., Plaintiffs and Appellants, v.
EMPIRE CONSTRUCTION CO., LTD., et al.,
Defendants and Respondents.

## COUNSEL

Joseph L. Bortin for Plaintiffs and Appellants.

Knecht, Dingus, Fink & Boring, Gerald R. Knecht, Joseph L. Fink, Joseph A. Kiernan, Joseph H. Inglese and Bruce M. Lubarsky for Defendants and Respondents.

## OPINION

SULLIVAN, J.—In this action to quiet title, plaintiffs Adolfo and Consuaelo Majewsky appeal from a judgment which although declaring them to be the owners of certain real property, decreed that their interest therein was subject to judgment liens in favor of defendants.[1] (Code Civ. Proc., § 674.)[2]

The evidence which is uncontradicted discloses the following facts. On January 11, 1965, one Allen Waugh entered into an agreement in writing[3] with Irving and Beatrice Cuslidge to purchase from the latter a parcel of real property in San Francisco for $11,000. Waugh then endeavored to find a buyer who would pay $12,500 for the property. He

[1]Defendants are: Empire Construction Co., Ltd.; Glens Falls Insurance Company (assignee of Empire); United California Bank; and Anderson & Perkins, Inc.

[2]Code of Civil Procedure section 674 provides in pertinent part that an "abstract of the judgment or decree of any court of this State, including a judgment of any court sitting as a small claims court, or any court of record of the United States . . . may be recorded with the recorder of any county and from such recording the judgment or decree becomes a lien upon all the real property of the judgment debtor, not exempt from execution, in such county, . . ."

[3]A printed form adopted by the San Francisco Real Estate Board and entitled "Uniform Agreement of Sale and Deposit Receipt."

approached Fuentes, a real estate broker, who was not interested but who referred him to Gummufsen, another broker.

Mr. Gummufsen contacted plaintiff Adolfo Majewsky, also a real estate broker, who indicated an interest in the property. He provided the latter with a preliminary title report showing that on January 11th the property was vested in Mr. and Mrs. Cuslidge and that it was not subject to any liens or encumbrances. Mr. Majewsky inspected the property, talked to the tenant and eventually informed Gummufsen that he would make an offer on the property. On January 23, 1965, Mr. and Mrs. Majewsky entered into an agreement in writing to purchase the property and improvements for $12,500. The agreement[4] was signed by Gummufsen "as agent for sellers."

An escrow was opened at First American Title Company which had issued the preliminary title report mentioned above. The title company's file for this particular escrow was received in evidence below and has been transmitted to this court. The file contains among other documents, copies of both the agreement of sale dated January 11th and the agreement dated January 23d, as well as instructions by all of the parties. Mr. and Mrs. Cuslidge deposited in the escrow their deed to Allen and Dorothy Waugh with a demand for $11,000; Mr. and Mrs. Waugh deposited their deed to Mr. and Mrs. Majewsky with a demand for $12,500 and instructions to pay $11,000 on delivery of the Cuslidge deed, broker's commission and other charges and to remit the balance to them. Mr. and Mrs. Majewsky deposited the sum of $11,655.28 representing the balance[5] due on the purchase price and closing costs with instructions providing for the disbursement of all funds upon delivery of a deed and issuance of a standard form title insurance policy in the amount of $12,500 insuring title to be vested of record in their names subject only to taxes and assessments not delinquent.

Upon the closing of the escrow $11,014.18 was paid to the Cuslidges, $1,109.25 to the Waughs, $375 as commission to the broker and $156.85 to the title company. The deed from the Cuslidges to the Waughs was recorded immediately before the deed from the Waughs to the Majewskys.

Mr. Majewsky repaired and improved the property. When he decided to sell it in September 1965, he ordered a preliminary title report and learned for the first time that the property had been conveyed to him by

---

[4]A printed form of Uniform Agreement of Sale and Deposit Receipt identical with that used in the Waugh-Cuslidge transaction (see fn. 3, *ante*). The January 23d agreement however nowhere contains the names of either the Cuslidges or Waughs.

[5]After receiving credit for their deposit of $1,000 paid on execution of the deposit receipt dated January 23, 1965.

the Waughs and that his title was subject to judgment liens against the Waughs amounting to approximately $50,000. The Majewskys had never heard of the Waughs before. Shortly thereafter they commenced the instant action.[6]

The trial court found and concluded that the subject property was purchased by the Waughs from the Cuslidges for a valuable consideration; that it was then sold by the Waughs to the Majewskys for a valuable consideration; that the only cash deposited in the escrow was that of Majewskys'; that neither Allen nor Doris Waugh acted as trustee for the Majewskys in the purchase and sale transactions; that the judgment liens attached during the period of ownership of the property by the Waughs; and that although plaintiffs Majewsky were the owners, their interest in the property was subject to the liens and plaintiffs were not entitled to a decree quieting title as against such liens. Judgment was entered accordingly.

Since the controlling facts of the controversy are clear and undisputed, and susceptible of but one rational inference, the crucial issue confronting us is one of law. (See *Baugh* v. *Rogers* (1944) 24 Cal.2d 200, 206 [148 P.2d 633, 152 A.L.R. 1043]; cf. *Mah See* v. *North American Acc. Ins. Co.* (1923) 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123].) We must determine whether the liens of the judgments against the Waughs attached to the property during the brief, indeed minute, period of time in which Mr. and Mrs. Waugh held title. Contending that no liens attached, plaintiffs argue that the Waughs were trustees or mere conduits;[7] that having no money of their own invested in the property but rather "using" that of plaintiffs, the Waughs "had no right to control the title" but could only "pass it on to plaintiffs"; and that since they had only "naked title" no liens attached. We find no basis in law or in the record for such a claim and have concluded that the decision of the trial court should be upheld. We affirm the judgment.

We think that the uncontradicted evidence establishes, as indeed the trial court determined, that there were here two separate and independent sales of the property, based upon two separate agreements of sale, supported by separate considerations and effectuated by separate conveyances. Apart from the Majewsky agreement of January 23d and regardless of

[6]Plaintiffs inform us that they have already 'received payment from the title insurance company to the extent of the latter's liability under the policy of title insurance issued plaintiffs but assert that their actual loss exceeds the proceeds of the policy.

[7]Plaintiffs assert "The Waughs were express, resulting or constructive trustees, only; or mere conduits, through which title passed." However, as we explain *infra,* plaintiffs confine themselves to the point that the facts give rise to a resulting trust.

its continued vitality, eventual performance or sudden demise, the agreement of purchase and sale entered into between the Cuslidges and the Waughs had its own exclusive and individual existence. It made no reference to the later agreement; nor was it conditioned in any way upon the existence or performance of the latter. By the terms of the January 11th agreement, Waugh was bound to purchase the property for the stipulated consideration. There was nothing to prevent his deposit of his own funds in order to carry out the agreement; he could have discharged his obligations as buyer under this agreement leaving a longer interval of time to discharge his obligation as seller under the later agreement. Indeed, if for some reason the later agreement could not be performed, Waugh would nevertheless remain bound to the Cuslidges and required to perform his agreement with them according to its terms, and at the time of performance to pay them the stipulated $11,000 for their deed.

■ The clear facts of this case show that Waugh contracted to buy from the Cuslidges and then contracted to sell to the Majewskys so that he could make a profit. These were two separate sales in which he participated first as buyer and then as seller; he dealt with each of his opposite contracting parties at arm's length. He was in no way different from countless others who acquire property in the hope of reselling it at a profit. There is simply nothing in the record before us which makes these two transactions one or which transmogrifies Waugh, the entrepreneur, acting for his own gain, into Waugh, the trustee, acting in the interest of another.

Nor did these two separate transactions whose individual entities had been already established, become coalesced by being processed in a single escrow or with a simultaneous closing.

The facts of the instant case exemplify what has been called a "middleman" escrow. "A, as seller, and B, as purchaser, give separate instructions to X, escrow holder, for the sale and purchase of Blackacre for $10,000. B, as seller, and C, as purchaser, give separate instructions to X, escrow holder, for the sale of Blackacre for $15,000. B, of course, is acquiring the land from A and reselling it to C at a $5,000 profit. *There are technically two escrows;* but the escrow holder is the same, the two escrows are to be closed together, and the instructions are often kept in the same portfolio." (Ogden's California Real Property Law (1956), § 21.4(4)(c), p. 904, italics added.)[8]

---

[8]The confidential character of the multiple instructions in a "middleman" escrow provides additional proof that it actually consists of two escrows. The above cited authority continues: "The rules applicable to disclosure of escrow instructions in this case are as follows:

"A is entitled to see B's instructions relative to the purchase from A, but he is not entitled to information as to the instructions between B and C.

In sum, Mr. and Mrs. Waugh, pursuant to the agreement dated January 11, 1965 with Mr. and Mrs. Cuslidge, acquired the subject property as their own, albeit with the objective in view of reselling it at a profit. At the time of such acquisition there were, and prior thereto had been, judgments outstanding against the Waughs of which abstracts had been properly recorded in San Francisco. Upon recordation of such abstracts with the county recorder each "judgment or decree becomes a lien upon all the real property of the judgment debtor, not exempt from execution, in such county, *owned* by him at the time, *or which he may afterward and before the lien expires, acquire.* . . ." (Code Civ. Proc., § 674, italics added.) It is manifest that when the Cuslidges delivered their deed to the Waughs, the latter *acquired* the subject property as the actual owners on their own behalf,[9] and not in trust or as agents on behalf of any other person or persons. At the instant of such acquisition, the existing liens attached. To ignore their operative effect because the Waughs immediately conveyed to plaintiffs, would be to frustrate the purpose of the statute and emasculate its provisions by conditioning their efficacy upon the length of time the judgment debtor owned the property. The above statute took effect the *instant* the judgment debtor acquired the property irrespective of how long he might decide to hold it.

Nevertheless plaintiffs contend that all of the foregoing conclusions must yield to trust principles brought into play by the circumstances that the Waughs in acquiring the property "used" the Majewskys' money without the latter's knowledge or consent. As we have said, plaintiffs do not advance a precise thesis, being content with the scattershot attack that the "Waughs were express, resulting *or* constructive trustees, only." (Italics added.) However, plaintiffs make no argument that there was an express trust in the instant case, as it seems obvious they cannot (see Rest. 2d Trusts, §§ 2, 23), and we need not consider the point.

"B is entitled to see the instructions of either A or C.

"C is entitled to see only the instructions of B concerning the sale from B to C. (Farmer, Escrows, p. 74.)

"X, the escrow holder, is under no legal duty—in fact, it would be a breach of confidence—to inform A or C as to the terms or existence of the escrow to which either is not a party, assuming that the instructions do not expressly demand such information. (*Blackburn* v. *McCoy,* 1 C.A.2d 648; *Shiver* v. *Liberty Building-Loan Assn.,* 16 Cal.2d 296, remarks of J. Carter at p. 308.)" (Ogden, *op. cit. supra.*)

[9]Since, as we have explained, the Waughs became the actual owners of the property, they did not take mere "naked" title. We therefore find inapplicable plaintiffs' authorities cited for the propostitions that "the lien of a judgment does not attach to a naked title but only to the judgment debtor's interest in the real estate; and if he has no interest, though possessing the naked title, then no lien attaches. [Citation.]" (*Davis* v. *Perry* (1932) 120 Cal.App. 670, 676 [8 P.d 514]; see also *Iknoian* v. *Winter* (1928) 94 Cal.App. 223, 225 [270 P. 999].)

All that we can glean from plaintiffs' briefs is the semblance of an argument that the Waughs' use of the Majewsky money gave rise to a resulting trust. But a resulting trust, like an express trust, is based on the manifestation of intention of the person creating it. (Rest. 2d Trusts, § 1, com. e, p. 5; see also 4 Witkin, Summary of Cal. Law (7th ed. 1960) Trusts, § 80, p. 2964; 5 Scott, Trusts (3d ed. 1967), § 404.2, p. 3215; § 440.1, p. 3315.) ■ Contrary to plaintiffs' apparent position here, a "resulting trust is not founded on the simple fact that money or property of one has been used by another to purchase property. It is founded on a relationship between the two, on the fact that as between them, *consciously and intentionally,* one has advanced the consideration wherewith to make a purchase in the name of the other. The trust arises because it is the natural presumption in such a case that it was their *intention* that the ostensible purchaser should acquire and hold the property for the one with whose means it was acquired." (*Lezinsky* v. *Mason Malt W. D. Co.* (1921) 185 Cal. 240, 251 [198 P. 884], italics added; see also *Berniker* v. *Berniker* (1947) 30 Cal.2d 439, 447 [182 P.2d 557]; *Seabury* v. *Costello* (1962) 209 Cal.App.2d 640, 645 [26 Cal.Rptr. 248]; *Baskett* v. *Crook* (1948) 86 Cal.App.2d 355, 362 [195 P.2d 39]; *Treager* v. *Friedman* (1947) 79 Cal.App.2d 151, 167-168 [179 P.2d 387]; *Owings* v. *Laugharn* (1942) 53 Cal.App.2d 789, 792 [128 P.2d 114].) ■ Plaintiffs have not directed our attention to any facts in the present record satisfying the requisite fact of intention. *McGee* v. *Allen* (1936) 7 Cal.2d 468 [60 P.2d 1026] and *Mercantile Collection Bureau* v. *Roach* (1961) 195 Cal.App.2d 355 [15 Cal.Rptr. 710], cited in support of their claim of a resulting trust are distinguishable on their facts, involve transactions manifesting the requisite intention of the parties, and, therefore, require no detailed consideration.

Apart from the bare assertion quoted above, plaintiffs make no argument and furnish no authorities in support of a claim that the Waughs' use of the money gave rise to a constructive trust. Since plaintiffs do not press the point, we do not feel obliged to treat it in detail.

The general rule (subject to exceptions not here pertinent) is that "Where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid, . . ." (Rest. 2d Trusts, § 440, p. 393.) This rule "is applicable not only where the purchase price is paid directly to the vendor by a person other than the transferee, but also where the purchase price is paid to the vendor by the transferee with money or other property belonging to another person with the consent of the other person. Thus, when a transfer of property is made to one person and the purchase price thereof is paid by him with money or other property belonging to another

person with the consent of the latter, a resulting trust arises in his favor." (Rest. 2d Trusts, § 440, com. h, p. 395.) Comment h, however, continues: "If the other person did not consent to the use of his money or other property in making the purchase, or did not consent that the property purchased should be transferred to the transferee, a constructive trust and not a resulting trust arises." (Accord. *Fulton* v. *Jansen* (1893) 99 Cal. 587, 590-591 [34 P. 331]; 5 Scott, *op. cit. supra,* § 404.2; Bogert, Trusts (2d ed. 1964), § 451, at 498-499.)

Under the last theory, it is conceivable that, in some instances, a person wrongfully using the money of another to acquire title to property would be under the equitable duty to convey it to the former in order to prevent unjust enrichment. (Rest., Restitution, § 160; see also *Bainbridge* v. *Stoner* (1940) 16 Cal.2d 423, 428-429 [106 P.2d 423]; 5 Scott, *op. cit. supra,* § 404.2.) We do not perceive however and plaintiffs do not establish from the record, that the Waughs wrongfully converted or appropriated the Majewskys' funds and used them to acquire the property within the principles of constructive trusts. Indeed, we would say that the Waughs did not convert or appropriate the funds at all. It is only when the entire middleman escrow, after being closed, is viewed in retrospect that one may say that *in effect* the Waughs used the funds. But the establishing of a single escrow was due solely to a decision and practice of the title company, apparently a settled and accepted practice in the title insurance field (see Ogden, *op. cit. supra*), and not due to any act, much less scheme, of the Waughs. The escrow files show that Mr. and Mrs. Majewsky's money was paid to the title company. Presumably in this type of escrow where the title company is called upon to make a simultaneous closing of actually two escrows, the title company in taking seller's instructions from the Waughs *on the same day* as it took buyer's instructions from the Majewskys' (along with the purchase price) took the "short-cut" of crediting the Waughs with the $12,500 coming from the Majewskys' and debiting them with the $11,000 due the Cuslidges. We cannot impute fraud or wrongdoing to the Waughs, or conclude that they were unjustly enriched, merely because the title company employed such adjustments without requiring the Waughs to deposit cash of their own for the purchase of the property.

The judgment is affirmed.

McComb, J., Peters, J., and Burke, J., concurred.

**MOSK, Acting C. J.**—I dissent.

The majority search for a resulting trust and fail to find the parties "consciously and intentionally" entered into a trust relationship. What they

overlook is that under these circumstances, an intention is *presumed* by operation of law. Since 1872, Civil Code section 853 has provided "When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

This is precisely the kind of case in which such presumption should be invoked in order to avoid a gross miscarriage of justice. The "transfer of real property" referred to in section 853 was initially made to Waugh, but "the consideration therefor," also as provided in that section, was paid entirely by the plaintiff. No funds other than those of the plaintiff were deposited in the single escrow used in this transaction.

The plaintiff paid $12,500 into escrow, presumably to the property owners, the Cuslidges. He was unaware that Waugh intended to, or did, acquire any interest in the property. At no time did he consent to Waugh acquiring any interest in the property. To now saddle plaintiff with liens for some $50,000 worth of Waugh's indebtedness—approximately four times the value of the property—merely because Waugh acquired a theoretical transitory title is the ultimate in exalting form over substance.

Conceivably we could find a constructive trust here. However, these facts more properly qualify as a textbook illustration of a resulting trust. By definition a resulting trust arises from a transfer of property under circumstances indicating that the parties did not intend the transferee to take a beneficial interest. (Rest., Trusts, §§ 404, 440, 456.) It cannot be denied that no one intended Waugh to acquire any interest in the property. Witkin points out that a resulting trust has been termed "an intention-enforcing" trust to distinguish it from a constructive or "fraud-rectifying" trust. (4 Witkin, p. 2964.) The resulting trust, differing from both the express trust and the constructive trust, arises by operation of law. And, as indicated above, Civil Code section 853 is the law pursuant to which this trust arises.

To find a constructive trust, we would be required to impute fraud to one of the parties, presumably Waugh. Yet the evidence establishes no fraud, undue influence or wrongful act. Waugh perpetrated no deliberate deception and the evidence indicates no awareness by him or any of the parties that his participation in the transaction would benefit his creditors. Indeed, his intention was to transfer unencumbered title; thus arises what Witkin describes as an "intention-enforcing" trust.

*Murphy* v. *Clayton* (1896) 113 Cal. 153 [45 P. 267] is remarkably comparable to the instant case. There plaintiff put up half the purchase price, the deceased the other half, and title was taken only in the name of the deceased. Upon his death, creditors of the deceased sought to assert claims

against the whole of the property, insisting they were entitled to priority over the secret equity of the plaintiff. The court found "no act, conduct, or admission upon the part of respondent by which the creditors were induced to give credit" and none of the creditors "knew that the title to the property stood in his name." There was no estoppel, and thus the court imposed a resulting trust, noting that there "is nothing illegal or against public policy in the mere fact that a party equitably entitled to real property permits the legal title to remain in another; resulting trusts are fully recognized by our law; . . ."

The majority of the court improvidently granted a hearing in this case. The Court of Appeal properly decided the matter. I therefore adopt in dissent the opinion of Presiding Justice Shoemaker, concurred in by Justices Agee and Taylor (Cal.App.; 76 Cal.Rptr. 214). Their opinion, in relevant part, follows:

The sole issue presented by this appeal is one of law which, under the settled rule followed in this state, must be resolved favorably to plaintiffs. The rule, as stated in Ogden's California Real Property Law (1956) section 15.13(4), page 562, is that "The lien of a judgment does not attach to the *naked legal title* to real property held by the *judgment debtor in trust,* as where the debtor takes legal title as a mere agent or conduit in effecting a transfer from the seller to a purchaser, or where the mere legal title is held by the debtor as trustee under an express trust or under a resulting trust in favor of a third party who paid the purchase price of the property."

In *Zenda Mining & Milling Co.* v. *Tiffin* (1909) 11 Cal.App. 62, 65 [104 P. 10], the court stated, " 'the doctrine is well established that where land is purchased in the name of one person, and the consideration is paid by another, the land will be held by the grantee in trust for the person furnishing the consideration.' (*Riley* v. *Martinelli,* 97 Cal. 575 [33 Am.St. Rep. 209, 32 Pac. 579]; *Currey* v. *Allen,* 34 Cal. 254; Civ. Code, sec. 853.) 'Whenever one is a mere conduit, as where he purchases property in his name as the agent of another, with the latter's funds, and subsequently conveys to him, there is no interest to which a judgment lien can attach.' (Freeman on Judgments, § 373.)" (To the same effect, see *Riverdale Mining Co.* v. *Wicks* (1910) 14 Cal.App. 526, 534-537 [112 P. 896]; *Iknoian* v. *Winter* (1928) 94 Cal.App. 223, 225-226 [270 P. 999]; *Spear* v. *Farwell* (1935) 5 Cal.App.2d 111, 114 [42 P.2d 391]; *Schriber* v. *Alameda etc. Title Ins. Co.* (1958) 156 Cal.App.2d 700, 707 [320 P.2d 82].)

Defendant lienors contend that the rule above set forth should be deemed inapplicable because the Waughs purchased the property from the Cuslidges for "a valuable consideration" of $11,000 and because there was no express agreement between the plaintiffs and the Waughs to the effect that

the Waughs were acting solely as agents of plaintiffs. We do not agree. The undisputed evidence established and the trial court found that all of the funds deposited into the escrow were furnished by plaintiffs. A portion of these funds, $11,000, was paid to the Cuslidges for the property. The Waughs never paid any funds of their own for the property and were never in a position to claim any interest in it. Their absolute duty was to convey the property to plaintiffs. In a case such as this, the Waughs served as a "mere conduit" and their interest was not one to which the outstanding judgment liens could attach. Defendants' reliance upon the absence of any express agreement of agency between plaintiffs and the Waughs is misplaced. The Waughs did not acquire a greater interest in the property because their role in the transaction was a surreptitious one and returned a profit to them by the use of plaintiffs' money, without their knowledge or consent.

I would reverse the judgment.

**TOBRINER, J.**—I concur in the conclusion of Justice Mosk that when the Waughs acquired legal title they held this title subject to a trust in favor of the Majewskys, and therefore defendant judgment creditors' liens did not attach to the realty. I would prefer to rest this conclusion, however, upon a theory of constructive trust.

All three opinions begin with the premise that if, during that scintilla of time when the Waughs held legal title to the property in question, the Majewskys owned equitable title, then the liens of the Waughs' judgment creditors cannot attach. As stated in *Wheeler* v. *Trefftzs* (1964) 228 Cal. App.2d 271, 274 [39 Cal.Rptr. 507]: "It is the law in California that the lien of a judgment does not attach to a naked title, but only to the judgment debtor's interest in the real estate, and if he has no interest, through possessing the naked title, then no lien attaches and a court of equity will permit the real owner to show that the apparent ownership of another is not real. . . . [W]here a creditor acts by judicial process to attach the property of his debtor to satisfy the debt, he acquires only the interest which the debtor actually possesses."[1] A judgment creditor does not have the status of a bona fide purchaser; he is treated as a purchaser with notice, and is subject to any latent equities which may be asserted against the debtor.[2]

A constructive trust is a remedy to redress unjust enrichment (Rest., Restitution, § 160) caused by fraud, accident, mistake, undue influence, viola-

---

[1] Accord: *Kinnison* v. *Guaranty Liquidating Corp.* (1941) 18 Cal.2d 256, 263 [115 P.2d 450]; *Schriber* v. *Alameda etc. Title Ins. Co.* (1958) 156 Cal.App.2d 700, 707 [320 P.2d 82].

[2] *McGee* v. *Allen* (1936) 7 Cal.2d 468, 473 [60 P.2d 1026]; *Kinnison* v. *Guaranty Liquidating Corp., supra,* 18 Cal.2d 256; *Wheeler* v. *Trefftzs, supra,* 228 Cal.App.2d 271, 274.

tion of trust, or other wrongful act. (Civ. Code, § 2224.) The majority opinion recognizes that a person wrongfully using another's money to acquire property could be found a constructive trustee of the property to prevent unjust enrichment (*ante,* p. 486). The opinion, however, finds no wrongful act by the Waughs and no unjust enrichment. It concludes that the use of one escrow and the shortcut of financing both sales with the Majewskys' money is the doing of the title company, and "we cannot impute fraud or wrongdoing to the Waughs, or conclude that they were unjustly enriched, merely because the title company employed such adjustments without requiring the Waughs to deposit cash of their own for their purchase of the property." (*Ante,* p. 486.)

We do not need to impute wrongdoing to the Waughs; it is clear on the record. The Waughs submitted into escrow a grant deed. Such a deed warrants, as a matter of law, that the grantor's estate is "free from encumbrances done, made, or suffered by the grantor . . ." (Civ. Code, § 1113). "Encumbrances" includes "all liens upon real property." (Civ. Code, § 1114.) The Waughs could not and did not perform this warranty, and presently stand in breach.

The Waughs did not reveal to the Majewskys or to the title company that seven abstracts of judgment had been recorded against them. This concealed information was material, and both reliance[3] and injury are clear. If the Waughs knew, or should have known, of the recorded abstracts of judgment their failure to disclose this fact is fraud (see Civ. Code, § 1710, subd. (3); *Barder* v. *McClung* (1949) 93 Cal.App.2d 692 [209 P.2d 808]); if the Waughs did not know of the abstracts, the transaction is tainted by mutual mistake respecting the title conveyed by the Waughs. For purposes of this case the distinctions between fraud and mistake are immaterial, for both are grounds for imposition of a constructive trust. (Civ. Code, § 2224.)

The unjust enrichment of the Waughs is also clear from the record. The Waughs received $1,500 cash profit on the sale, and, if a constructive trust is not imposed, property worth at least $12,500 will be applied to pay the Waughs' creditors and thus to reduce their outstanding debts. In return for all this the Waughs will have conveyed land so encumbered with liens that the interest conveyed is valueless.

---

[3]The recorded abstracts of judgment are public records. The victim of fraudulent misrepresentations as to title, however, is not denied relief under a theory of constructive notice of public records; recovery is barred only if reliance on the representation was not justifiable. (*Seeger* v. *Odell* (1941) 18 Cal.2d 409, 415 [115 P.2d 977, 136 A.L.R. 1291]; *Conlan* v. *Sullivan* (1895) 110 Cal. 624 [42 P. 1081]; *Barder* v. *McClung* (1949) 93 Cal.App.2d 692, 697 [209 P.2d 808].) The Majewskys did not, and could not reasonably be expected to, research title themselves.

Before the title company could disburse the $12,500 deposited by the Majewskys, it had to receive a deed from the Waughs to the Majewskys. (See *Kelly* v. *Steinberg* (1957) 148 Cal.App.2d 211 [306 P.2d 955].) By depositing into escrow a deed whose warranties of title would not be performed, and by not disclosing the existence of the judgment liens, the Waughs led the title company into the mistaken belief that this condition had been complied with, and thus brought about the wrongful appropriation of the Majewsky funds. Moreover, in disbursing these funds, $1,500 to the Waughs and $11,000 to perform the Waughs' agreement with the Cuslidges, the title company was following the escrow instructions of the Waughs. Thus, whether we speak of direct liability or imputed liability, the Waughs wrongfully caused the monies deposited by Majewsky to be disbursed to the Waughs or applied for their benefit. Once misappropriated, the monies deposited are impressed with a constructive trust.

A portion of this trust fund was paid to the Cuslidges in consideration for title to the land in question; consequently, that land too is held in constructive trust and the Majewskys, as beneficiaries of the trust, have priority over other creditors of the Waughs. (4 Witkin, Summary of Cal. Law (1960), pp. 2941-2942; see Rest.2d, Trust, § 202; Rest., Restitution, § 202; *Noble* v. *Noble* (1926) 198 Cal. 129 [243 P. 439, 43 A.L.R. 1235].)[4]

The fact that only one escrow was used greatly facilitates our ability to trace the misappropriated monies into the property, and the majority opinion stresses that the decision to use a single escrow was made by the title company and not by the Waughs. I doubt that the use of a single escrow, in which the Waughs need not put up any money, was mere happenstance; $50,000 in unsatisfied judgments was outstanding against the Waughs, and one wonders whether they could have raised the $11,000 cash required to fulfill their agreement with the Cuslidges. In any event, the unjust enrichment is plain, and, thanks to the fact that a single escrow was used, the remedy of constructive trust is available to redress the wrong. The possibility that, if a double escrow had been used we would find it

---

[4]It has been suggested that the argument for a constructive trust in this case rests on circular reasoning; that the assumption that the judgment liens would attach to the property is what gives rise to a duty to disclose those liens, but the imposition of a constructive trust prevents the liens from attaching and thus contradicts that assumption. This sort of pseudo-circularity is inherent in the constructive trust remedy, and in any remedy which attempts to cure a wrong by placing the parties in the position they would have occupied had the wrong not occurred. Take the simplest case for a constructive trust: defendant acquires plaintiff's property by fraud. To impose a constructive trust, we assume that defendant got title to plaintiff's property, but the imposition of a constructive trust restores title to plaintiff *ab initio*. The appearance of circularity of reasoning simply shows that the remedy has worked to obliterate the effect of the fraud or mistake.

more difficult to utilize a constructive trust theory should not give us pause;[5] we have the means to redress injustice on the facts of this case, and should not hesitate because in another and different case it would be more difficult to achieve this end.

Appellants' petition for a rehearing was denied May 20, 1970. Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.

---

[5]In such a case the injured party might still obtain redress by an action in negligence against the escrow holder. (See *Spaziani* v. *Millar* (1963) 215 Cal.App.2d 667, 682-683 [30 Cal.Rptr. 658].)