[Civ. No. 51648. First Dist., Div. One. May 13, 1985.]

HUDSON PROPERTIES CO., INC., Plaintiff and Appellant, v.
GOVERNING BOARD OF CAMPBELL UNION ELEMENTARY
SCHOOL DISTRICT OF SANTA CLARA COUNTY et al.,
Defendants and Respondents;
L. B. NELSON CORPORATION, Defendant and Appellant.

COUNSEL

Donald D. Howard, Gregg L. Kays, Paul David Marotta, Steven E. White, Popelka, Allard, McCowan & Jones and Popelka, Allard, McCowan, Jones & Howard for Plaintiff and Appellant.

Robert T. Russell, Jonathan Greenfield and Ware, Fletcher & Freidenrich for Defendant and Appellant.

M. Carol Stevens, Janice E. Johnson, William F. Kay, Kathy Andreola, Whitmore & Kay and Whitmore, Kay & Stevens for Defendants and Respondents.

OPINION

**HOLMDAHL, J.**—This appeal concerns the interpretation of former Education Code section 39369.5.

The judgment is affirmed, but remanded for further proceedings.

*Statement of Facts*[1]

As enacted in 1977, former Education Code section 39369.5[2] applies to the case before us. It provided, in relevant part, that "(a) In the event that the governing board of a school district, intends to sell real property pursuant to this article, the former owner from whom the district acquired the property shall be accorded the right, prior to the final acceptance of bids, to purchase the property at the tentatively accepted highest bid price."[3]

Defendants John and Hilda Marovich (hereafter, Maroviches) are the former owners of what is now the Hamilton School property. Maroviches sold the property to Campbell Union Elementary School District (hereafter, District) in 1952.

On April 17, 1979, District determined that the Hamilton property was no longer needed for school purposes, and resolved to sell it to the highest bidder at a public auction to be held on August 9, 1979. The resolution expressly stated that the acceptance of any bid was to be "subject to the prior rights of the various public agencies and former owners." It also stated that "District reserves the right to accept or reject any and all bids."

---

[1]The facts have been taken from the parties' stipulation of facts.

[2]All statutory references are to the Education Code, unless otherwise specified.

[3]The complete statute then provided: "(a) In the event that the governing board of a school district, intends to sell real property pursuant to this article, the former owner from whom the district acquired the property shall be accorded the right, prior to the final acceptance of bids, to purchase the property at the tentatively accepted highest bid price.

"(b) At any time after the notice of meeting given pursuant to Section 39369, and prior to the date of such meeting, the prior owner from whom the district acquired the property may submit to the governing board written notice of intention to purchase the property at the tentatively accepted highest bid price. Such notice does not constitute an offer to purchase.

"(c) Bids, both written and oral, shall be submitted and acted upon by the governing board in the manner otherwise prescribed by this article, except that the acceptance of a bid shall be tentative only, subject to the right of the former owner to purchase the property.

"(d) Upon receipt of bids, the governing board shall offer to sell the property to the former owner at the tentatively accepted highest bid price, subject to the terms and conditions of sale initially fixed by the board.

"(e) In the event that the former owner rejects the offer, the governing board shall sell the property to the highest responsible bidder, by final acceptance of the bid theretofore tentatively accepted."

The statute was amended in 1980. A former owner no longer has a right of first refusal.

On July 6, 1979, Maroviches entered into a written agreement with P. Michael Hunt (hereafter, Hunt). Maroviches were to repurchase the Hamilton property from District after the bidding had taken place. Hunt was to provide the necessary funding. The agreement stated, in part: "Consideration for this option to purchase will be $500.00 payable upon execution of this Agreement." Maroviches also gave Hunt "the option to purchase the property for $5,000.00 more than the sum paid to the Campbell Union School District . . . ." Hunt subsequently paid Maroviches $500, and Maroviches informed District that they intended to purchase the property at the highest bid price.

In the meantime, L. B. Nelson Corporation (hereafter, Nelson) had become aware of the Hamilton property and deemed its acquisition advisable. Nelson learned that Maroviches were the former owners. Nelson contacted them, and they referred Nelson to Hunt. Nelson and Hunt entered into a written agreement on August 9, 1979, before the bidding commenced, whereby Nelson obtained the rights that Hunt had acquired from Maroviches in consideration of $10,000, plus $90,000 if Nelson closed on the purchase.

The auction was held, as planned, on August 9, 1979. Written bids were received from five bidders, including plaintiff Hudson Properties Co., Inc. (hereafter, Hudson) and Nelson. The highest bid, in the total amount of $1,760,132, was submitted by Nelson. Oral bidding followed. Nelson bid once at $2,005,000. Hudson made the last and highest bid of $2,425,000. This bid was tentatively accepted, subject to the rights of the former owners and "subject to final acceptance of any bid by the Governing Board pursuant to statute and the bid documents."

At the conclusion of the oral bidding, Maroviches' attorney announced their intention to exercise their right to purchase the property on behalf of Nelson, at the highest bid price, $2,425,000.

On August 10, 1979, Maroviches, Hunt, and Nelson entered into an agreement. Hunt agreed "to assign his rights" to Nelson; Maroviches consented to "Hunt's assignment" and agreed to have Nelson act as their agent. Maroviches gave notice of this agreement to District and as a deposit delivered a check drawn by Nelson.

District confirmed the sale to Maroviches on August 15, 1979, and executed a grant deed to them. Nelson paid Hunt the sum of $10,000.

### Procedural History

On September 7, 1979, plaintiff Hudson filed this action in Santa Clara County Superior Court, seeking injunctive and declaratory relief against

District, Nelson, Hunt, and Maroviches. Hudson sought: (1) To prevent the sale of the property by District to Nelson or Maroviches; (2) to restrain defendants from developing the property pending a declaration of rights; (3) a declaration that Hudson's bid on the property was the highest and an order compelling the sale of the property to Hudson; and, (4) a declaration that former section 39369.5, pursuant to which District was planning to sell to Maroviches, was unconstitutional.

On October 19, 1979, the trial court granted a preliminary injunction. The action was later tried without a jury. On August 19, 1980, the trial court, in a memorandum of intended ruling, determined that former section 39369.5 applied retroactively to Maroviches; that Maroviches had granted an option to Hunt, rather than an assignment of their rights; that the statute as applied to Maroviches was unconstitutional because it conferred a gift upon them; and, that the court lacked jurisdiction to compel sale of the property to Hudson. On December 15, 1980, the trial court made its judgment in accordance with the intended decision, finding null and void any agreement by District to sell the property to Maroviches.

Nelson filed a timely appeal from that portion of the judgment declaring the statute unconstitutional and negating the rights of Maroviches. Hudson filed a timely cross-appeal from that portion of the judgment holding that the court lacked jurisdiction to order the sale of the property to Hudson.

### Retroactivity of Former Section 39369.5

█ We first address the question of whether former section 39369.5 operates retroactively as to Maroviches as former property owners who conveyed to District before the statute was enacted.

We initially observe that this issue was implicitly resolved in *Al J. Vela & Associates, Inc.* v. *Glendora Unified School Dist.* (1980) 108 Cal.App.3d 444 [166 Cal.Rptr. 732], the sole case addressing the statute in the form now in question. The situation was the following: Ray and Frances Bloker owned real property which, in 1965, they sold to Glendora Unified School District. Frances thereafter died; Ray married Dorene who, in 1976, became the executrix of his estate. In 1977, the district decided to sell the property. Vela, one of the bidders, sought an injunction to prevent the sale of the property to Dorene, individually or as personal representative of her husband's estate. Dorene wished to exercise her right of first refusal under former section 39369.5. The trial court denied the injunction.

On appeal, the sole issue was whether the estate was a "former owner" under the statute. The appellate court found that it was not but that until his

death, Ray Bloker had qualified as a former owner: "We have determined the right of first refusal is limited by section 39369.5, subdivision (a) to former owners from whom the property was acquired. It follows that this right, being personal to Ray and Frances Bloker as former owners, terminated upon Ray's death . . . ." (*Al J. Vela & Associates, Inc.* v. *Glendora Unified School Dist., supra,* 108 Cal.App.3d 444, 449.) Implicit was a determination of the statute's retroactivity, since Bloker had sold his property to the district in 1965, and the statute became operative only in 1977.

We agree with this interpretation, which in our opinion conforms with legislative purpose as discussed below.

No express legislative intent on the issue of retroactivity appears in the legislative records, nor can we infer from the statutory language itself that a retroactive application was intended: The statute clearly is meant to apply to prospective sales of real property only, but is ambiguous as to whether its benefit extends to a former owner whose property was acquired by a school district before the statute became effective.

■ " '. . . Where the Legislature has not set forth in so many words what it intended, the rule of construction [giving a prospective interpretation] should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent. It is to be applied only after, considering all pertinent factors, it is determined that it is impossible to ascertain the legislative intent.' [Citation.] . . . A wide variety of factors may illuminate the legislative design, 'such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction.' " (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371], italics omitted; see also *Industrial Indemnity Co.* v. *Workers' Comp. Appeals Bd.* (1978) 85 Cal.App.3d 1028, 1031 [149 Cal.Rptr. 880].)

■ The statute was enacted at a time when the Legislature was facing the problem of an increase in surplus government property, particularly in the school system.[4] Former section 39369.5 appears to have been part of a general plan to dispose of this surplus government land. In keeping with that plan, the statute conferred upon former owners of such land a degree

---

[4]We take judicial notice, as did the trial court, of: (1) Enrollment Data for California Elementary and Secondary Public Schools in the years 1971 through 1978 which indicate a decline in school enrollment during those years; and, (2) an article in the "San Jose Mercury" dated September 20, 1979, attributing this decline to "a variety of factors," including "a low birthrate [and] the continuing trend toward smaller families."

of priority in reacquiring it.[5] The priority device served an equitable purpose, as offering the property to the former owner first was a recognition that the property had been acquired through condemnation or arguably its threat and that the reason for the school district's acquisition of his property no longer existed. At the same time, the school district would incur no loss, because the former owner was required to pay the property's probable fair market value, the highest bid price.

We infer, therefore, that section 39369.5 was intended to operate retroactively, as there is no apparently good or logical reason to limit or restrict accomplishment of these purposes by a prospective interpretation.

We conclude from the foregoing that Maroviches, as former owners under former section 39369.5, are entitled to the rights arising under that statute.

*Assignability of the Rights of the Former Owners*

Next, we discuss the assignability of the rights of the former owners.

In *Al J. Vela & Associates, Inc.* v. *Glendora Unified School Dist., supra,* 108 Cal.App.3d 444, 449, the court squarely held: "The statute, in clear and unequivocal language, limits the right of first refusal to not only a former owner, but to an owner 'from whom the district acquired the property.' The right created is thus personal to the grantor." The right of the former owners, Maroviches, being personal to them, is, therefore, not assignable.

The issue, then, is whether Maroviches assigned their rights to Hunt or Nelson, or simply granted an option allowing Hunt or Nelson to purchase the property from them once they had reacquired it.

This question is one of contract interpretation. The case was submitted on a stipulation of facts; there was no conflict in the evidence and no oral evidence. We, therefore, may make an independent determination of the meaning of the agreements. (*Parsons* v. *Bristol Development Co.*

---

[5]The sale of real property pursuant to article 4, chapter 3, part 23 (Sale or Lease of Real Property), which encompasses section 39369.5, was subject to Government Code section 54220 et seq., pertaining to disposition of surplus government land.

Section 39030 allowed the governing board of a school district to sell for less than fair market value, any school site deemed to be surplus property. Finally, section 39363.5 set up priorities and procedures for the sale of the property.

(1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 257, 259, pp. 4248, 4249-4250.)[6]

■■ ■■ An option is "a *contract*, made for consideration to keep an offer open for a prescribed period." (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 126, p. 124, original italics.) On the other hand, an assignment is the "*transfer* of title to any kind of property" (*id.*, § 726, p. 607, original italics); there " 'must be a manifestation to another person by the owner of the right indicating his intention to transfer, without further action or manifestation of intention, the right to such other person, or to a third person.' " (*Id.*, § 728, p. 609.)

■■ The Hunt-Maroviches agreement provides, in part: "P. Michael Hunt has the option to purchase the property for $5,000.00 more than the sum paid to the Campbell Union School District of Santa Clara County."

If this language constituted the entire agreement, it would be clear that Hunt had obtained an option to repurchase the property, once Maroviches had exercised their right of first refusal. In consideration of $5,000, Maroviches would have agreed to keep open an offer to resell the property to Hunt.

Our analysis, however, cannot end here, for the agreement also provides that Maroviches "do hereby agree, *upon receipt of written request from P. Michael Hunt to repurchase the above lands* . . . .

" . . . . . . . . . . . . . . . . . . . . . .

"It is understood that the undersigned will have the opportunity to purchase the property at the price equal to that of the highest bidder and *in turn will agree to re-sell the property to P. Michael Hunt. . . . It is understood that P. Michael Hunt will provide the monies for the undersigned to acquire the property and will pay escrow fees, recording fees, etc.* . . . [and] *legal fees* . . . not to exceed a total of $300.00. . . . [Maroviches] shall execute all necessary documents in [Maroviches'] name (*but for the benefit of P. Michael Hunt*) . . . ." (Italics added.)

From this language, it becomes clear that Hunt did not obtain an option to repurchase the property should Maroviches decide to exercise their right

---

[6]Nelson argues that we are barred from making such a determination by the conflicting inferences rule. That rule, however, "is sometimes stretched beyond reasonable limits by mistaking questions of law for questions of fact." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 256, p. 4247.) Here, the rule has no application inasmuch as this court is not drawing inferences from conflicting facts.

of first refusal; rather, Hunt obtained Maroviches' right of first refusal. Hunt agreed to provide the funding necessary for the repurchase by Maroviches and, in exchange, they became bound to resell the property to him. Hunt, in effect, would be making the purchase himself. The intent was to transfer title to the property; there was an assignment. The fact that Maroviches, rather than Hunt, actually exercised the right of first refusal, does not change the fact that they were acting as agents "for the benefit" of Hunt.[7]

This interpretation is supported by the later agreements of Hunt, Maroviches, and Nelson. The Hunt-Nelson agreement states: "Hunt represents that he is the owner of certain rights of first refusal for the purchase of said property . . . ." The later Hunt-Maroviches-Nelson agreement states:

"Whereas Marovich has previously assigned its Right of First Refusal to Hunt; and [¶] Whereas Hunt requested Marovich to exercise its Right of First Refusal . . . .

" . . . . . . . . . . . . . . . . . . . . . . . . .

"Now . . . [¶] . . . Hunt agrees to assign his rights to the Right of First Refusal to Nelson pursuant to separate agreement between them."

Nelson argues that the "double escrow procedure" used has no effect on the existence of the option to repurchase, and that the fact that Maroviches themselves were unable to finance the purchase and had to use Nelson's funds, does not invalidate the agreement, citing *Majewsky* v. *Empire Constr. Co., Ltd.* (1970) 2 Cal.3d 478 [85 Cal.Rptr. 819, 467 P.2d 547]. That argument overlooks an important point. It is true that *Majewsky* approved of the double escrow procedure. But it also discussed the issue of whether a resulting trust had arisen in favor of the plaintiffs: "Contrary to plaintiffs' apparent position here, a 'resulting trust is not founded on the simple fact that money or property of one has been used by another to purchase property. It is founded on a relationship between the two, on the fact that as between them, *consciously and intentionally,* one has advanced the consideration wherewith to make a purchase in the name of the other. The trust arises because it is the natural presumption in such a case that it was their *intention* that the ostensible purchaser should acquire and hold the property for the one with whose means it was acquired.'" (*Id.,* at p. 485, original italics.)

---

[7]We also note that the parties, including the Maroviches, stipulated that Maroviches "had no intention of attempting to exercise 'Rights of First Refusal' . . . . They were without financial capacity to purchase the property for their own account at all times from April 17, 1979, up through August 10, 1979."

Just as the intent of the parties is crucial for the operation of a resulting trust, so too is intent determinative here as to the interest acquired by Hunt and later, from him by Nelson. It is clear that all parties first intended that Maroviches acquire the property with funding from Hunt (the Hunt-Maroviches agreement), and later with funding from Nelson (the Hunt-Maroviches-Nelson agreement), and that Maroviches then convey the property to Nelson.

■ As previously discussed, a former owner is free to exercise his statutory right to repurchase his former property. He may also grant a valid option entitling a third party to purchase the property from him, once he has properly reacquired it. The owner may not, however, assign his right of repurchase. Here, the evidence indicates that the parties, in fact, contracted for an assignment, not an option. The intent of the statute—to grant a personal right to the former owner—should not be circumvented by semantics. This assignment, we conclude, was invalid.

### Constitutionality of Section 39369.5

The trial court determined that section 39369.5 was unconstitutional, in that it violated article XVI, section 6 of the California Constitution (the "gift clause"). On appeal, Nelson urges us to hold that the statute is constitutional.

We need not reach the issue. (See *California Teachers Assn.* v. *Board of Trustees* (1977) 70 Cal.App.3d 431, 443 [138 Cal.Rptr. 817].) Inasmuch as we have concluded that the rights of Maroviches were not assignable to Nelson, Nelson has no interest in the property and, therefore, would not be affected by our decision on the constitutionality question.

For the same reason, we do not discuss Hudson's argument that the statute violates the equal protection clause because it singles out specific individuals for a benefit.

### Disposition of the Property

Hudson filed a cross-complaint requesting a mandatory injunction compelling District to convey the property to Hudson. ■ The authority of a school district governing board is limited by the power conferred upon it by the Legislature, whether expressly or by necessary implication. (See *City and County of San Francisco* v. *Padilla* (1972) 23 Cal.App.3d 388, 400 [100 Cal.Rptr. 223].) ■ Consequently, we first determine whether, under statutory authority, District must sell the property to Hudson by virtue of its having tentatively accepted Hudson's bid.

Section 39369.5 provided (in subd. (e)): "In the event that the former owner rejects the offer, the governing board shall sell the property to the highest responsible bidder, by final acceptance of the bid theretofore tentatively accepted."

We observe that this subdivision applies only if the former owner "rejects the offer." In the case before us, former owners Maroviches did purport to accept by exercising their right. We have concluded, however, that the Maroviches exercised this statutory right only in a technical sense. Their acceptance on behalf of another party and acknowledgement that they did not want the property for themselves, in effect, constitute a rejection.[8]

Thus, given the event of the former owner's rejection, it initially appears under the language of former section 39369.5, subdivision (e), that District is compelled to sell the property to Hudson by final acceptance of the bid it previously tentatively accepted: The words "the governing board shall sell" connote mandatory action. (See *Rosenfield* v. *Superior Court* (1983) 143 Cal.App.3d 198, 202 [191 Cal.Rptr. 611].)

The matter, however, does not end there. We must construe the language of the statute in its totality and in keeping with other Education Code statutes on the same subject.[9] This principle is one of basic statutory construction (*Certificated Employees Council* v. *Monterey Peninsula Unified Sch. Dist.* (1974) 42 Cal.App.3d 328, 333 [116 Cal.Rptr. 819]) and one expressed in former section 39369.5 itself. Subdivision (c) expressly provided that "[b]ids . . . shall be . . . acted upon by the governing board *in the manner otherwise prescribed by this article.*" (Italics added.)

Section 39369.5, subdivision (e), provides not only that a board "shall sell" the property, but also that it shall sell "by final acceptance of the bid theretofore tentatively accepted." The words "final acceptance" are not defined in other relevant statutes of this code. We have found no pertinent case interpreting sections 39371 through 39375, their relationship with each other, or their relationship to former section 39369.5. In particular, the meaning to be given to "finally accepted," "final acceptance," and "session" as appearing in several of those provisions is determinative of the appeal before us. The several uses of each of these terms appear to be inherently inconsistent with each other, especially when related to the rights of a former owner, as set forth in former section 39369.5. Necessarily, we must endeavor to interpret these statutes to provide the most consistent,

---

[8]We note that Maroviches are not parties to this appeal. Consequently, the trial court's decision is final as to them.

[9]The key statutes referred to are sections 39371 through 39375.

coherent pattern possible. Furthermore, they are subject to two contradictory interpretations. They could be a reference to the *mechanism* by which a sale is consummated: Under section 39375, a session for final acceptance is required to occur "at the same session or at any adjourned session of the same meeting." Under this view, a board would be compelled to make the sale, and would do so by means of "final acceptance" at the same or a later session.

Alternatively, however, final acceptance is a *precondition* to sale. That is, once a board tentatively accepts the bid and the former owner has rejected the property, the board must hold a session for final acceptance, pursuant to section 39375, but could at that session exercise discretion to reject the bid. Under this view, discretionary power is conferred upon a board by section 39376, which provides: "The governing body may at the session, if it deems such action to be for the best public interest, reject any and all bids, either written or oral, and withdraw the property from sale or lease." Thus, under this view, final acceptance would occur only at the session for final acceptance, and if a board *chooses* finally to accept.

For the reasons stated below, we conclude that final acceptance is, indeed, a precondition, and that a board has latitude to "reject any and all bids" at the session for final acceptance.

Crucial to our analysis is the interpretation of the word "session" as it appears in section 39376, and which, as indicated, is not defined. It could be construed to refer only to the session at which bids are received and considered.[10] We conclude, instead, that it refers to the "session" for final acceptance referred to in the immediately preceding section 39375. That statute provides: "The final acceptance by the governing body may be made either *at the same session or at any adjourned session* of the same meeting held within the 10 days next following." (Italics added.) We conclude further that the "same session" as it appears in section 39375 refers to the "public session" of section 39371, at which bids are received.

A board, therefore, may make its "final acceptance" or "reject any and all bids" at the session at which bids are received *or* it may so act at a later, "adjourned session," pursuant to section 39376.

---

[10]For example, see section 39371 which states: "At the time and place fixed in the resolution for the meeting of the governing body, all sealed proposals which have been received shall, *in public session,* be opened, examined, and declared by the board. Of the proposals submitted which conform to all terms and conditions specified in the resolution of intention to sell or to lease and which are made by responsible bidders, the proposal which is the highest, after deducting therefrom the commission, if any, to be paid a licensed real estate broker in connection therewith, shall be finally accepted, unless a higher oral bid is accepted or the board rejects all bids." (Italics added.)

We recognize that our conclusions appear to be inconsistent with the apparently mandatory language of section 39369.5, as well as that of sections 39371[11] and 39372.[12] However, we conclude that the apparent legislative intent in section 39376 is that a board's authority to reject bids survives beyond a "final acceptance" of an appropriate oral bid pursuant to sections 39369.5 or 39371 or 39372.

Thus, we interpret section 39369.5, in conjunction with sections 39375 and 39376, to mean the following: Upon the former owner's rejection, a board, *if it sells the property,* must sell, under section 39369.5, to the bidder whose bid is found to be the highest responsible bid. A board, under section 39376, has discretion to sell the property or to withdraw it from sale, at the session for final acceptance, which may take place as provided by section 39375 "either at the same session or at any adjourned session." However, at that "session . . . any and all bids"—including any bid previously tentatively accepted under section 39369.5—may be rejected and the property withdrawn from sale, pursuant to section 39376.

### Conclusion

As applied to the facts of the present case, former section 39369.5, on its face, requires District to sell the property to Hudson. District, as soon as reasonably possible, shall call a public session for final acceptance of Hudson's bid, pursuant to section 39375.[13] At that session, under section 39376, District retains the right to make a "final acceptance" or to "reject any . . . bids . . . and withdraw the property from sale."[14]

[11]See footnote 10, *ante.*

[12]Section 39372 states: "Before accepting any written proposal, the board shall call for oral bids. If, upon the call for oral bidding, any responsible person offers to purchase the property or to lease the property, as the case may be, upon the terms and conditions specified in the resolution, for a price or rental exceeding by at least 5 percent, the highest written proposal, after deducting the commission, if any, to be paid a licensed real estate broker in connection therewith, then the oral bid which is the highest after deducting any commission to be paid a licensed real estate broker, in connection therewith, which is made by a responsible person, shall be finally accepted. Final acceptance shall not be made, however, until the oral bid is reduced to writing and signed by the offeror."

[13]Under section 39375, the session for final acceptance must take place within 10 days of the session for receiving bids. Obviously, in the present case it is not now possible—almost six years after the original sale—to conform to this requirement. The statutory scheme does not provide for the unusual and, perhaps, unique events which have occurred in this case, commencing with the trial court's determination that section 39369.5 is unconstitutional and culminating with our determination herein that, for other reasons, the former owner's bid must be deemed rejected. Nor is it now possible to arrive at a determination totally fair to all the parties after litigation has held their respective rights and responsibilities in suspense for almost six years. The fairest solution is to require the session to occur as soon as reasonably possible, in keeping with the apparent intent of section 39375.

[14]We note that this result is consistent with District's own presale resolutions reserving to itself discretion to reject bids.

In view of our determination that District is not compelled finally to accept Hudson's bid, which District had "tentatively accepted," we deny Hudson's request for a mandatory injunction.

To recapitulate, we have determined that: (1) Section 39369.5 is retroactive as to Maroviches, the former owners; (2) the statutory right of repurchase of Maroviches was not assignable and their assignment of their rights was void; and, (3) although District tentatively accepted Hudson's bid, it nevertheless has discretion under sections 39369.5 and 39376 either finally to accept that bid or to reject it and withdraw the property from sale, at the session for final acceptance, which it must conduct under section 39375.

We affirm the trial court's decision that District's agreement to sell the property to Maroviches was void,[15] and direct the trial court to order District to hold a session for final acceptance pursuant to section 39375, as discussed herein. In addition, the parties may petition the trial court for leave to file supplemental pleadings on the question of an equitable accounting. Upon such further proceedings as the trial court may deem appropriate, it may act on that issue.

Racanelli, P. J., and Elkington, J., concurred.

The petition of plaintiff and appellant for review by the Supreme Court was denied July 25, 1985.

---

[15]The trial court, as noted earlier, found section 39369.5 to be unconstitutional and determined that it had no authority to compel a sale by District. We, of course, did not address these issues, but " 'a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)